The appellant was indicted and convicted for murder in the first degree. Punishment was fixed at life imprisonment in the penitentiary. The appellant is most ably represented by Art Hanes, Sr. and Art Hanes, Jr. both at trial and on appeal.
In urging this court to order a reversal of his conviction, it is contended that the statements made by the appellant to law enforcement officers should not have been admitted because there was no showing of a voluntary, knowing and intelligent waiver of his right to remain silent. Additionally the appellant urges that it was reversible error for the trial court to admit the testimony of a law enforcement officer that the appellant would not make a statement.
The victim, Jill Scott (Webber), was a singer and entertainer in a Birmingham night club, The Forty Thieves. In February of 1974 Ms. Scott and Daryl James moved into Apartment 2005-G, Viewpoint (Longleaf) Apartments in Hoover, Alabama. Mr. James was a musician and the leader of the band in which Ms. Scott sang.
Scott and James cohabited until Mr. James moved out of the apartment around the first week of December, 1974, after they had some "difficulty" or "trouble". The appellant and Ms. Scott were married on December 19, 1974. The appellant is also a musician. Soon marital difficulties developed between the appellant and his wife.
In February, Ms. Scott told the appellant that she wanted a divorce because she thought their careers would be better as single people. She indicated that she may not stay with her present band and that the reason the appellant could not find work was because people were reluctant to hire him thinking that he was going to leave town with her.
During this same time, the appellant cut his beard so it would be easier to get a job and this angered Ms. Scott. She told the appellant that she could "make more money in one night by entertaining at private parties than (she) could by working all week with the band". The appellant then left the apartment for a couple of days only to return when Ms. Scott called him and told him that she didn't mean it and asked him to come back.
Ms. Scott's mother came to visit them and their arguments ceased for a time. However on the 5th of March, 1975, the appellant packed some of his clothes and left the apartment apparently because Ms. Scott again requested a divorce. That Saturday night the appellant spent in a Birmingham motel. He called some friends of his in Talladega County, Mr. and Mrs. Bob Rutledge, and went to spend a week with them in their home in the country because he "needed to get away for awhile and needed to talk to them". The appellant left without telling anyone of his whereabouts and his mother filed a missing person's report for him.
The appellant returned to Birmingham the following Sunday, March 27, 1975, and went to see Ms. Scott that night staying approximately two hours. Ms. Scott took the appellant to his parents' home where he was staying.
Monday Ms. Scott telephoned the appellant and told him that her sister and brother were going back home to Oshkosh, Wisconsin, on Thursday. Ms. Scott asked the appellant if he would like to go with them to the train station. The appellant agreed and made arrangements to borrow his father's automobile which was larger than his and would therefore carry more luggage. *Page 661 
On Wednesday the 26th of March the appellant met Ms. Scott at her apartment and together they went to the law office of Ferris Ritchey, a local Birmingham attorney. They signed the papers for the divorce. All of the evidence indicates that appellant did not want a divorce but signed the divorce papers because that was what Ms. Scott wanted. After that, the appellant and Ms. Scott returned to her apartment and had dinner together. About 8:00 that night the appellant left and returned to his parents' home.
On Thursday, by prearrangement, the appellant arrived at Ms. Scott's apartment about eleven A.M. to take her sister and brother to the train station. Because of the amount of luggage involved it was necessary to take two cars. Jan, Ms. Scott's sister, rode with the appellant and Jay, Ms. Scott's brother, rode with Ms. Scott. After the sister and brother were placed on the train, the appellant returned to Ms. Scott's apartment around 2:00 P.M. Not having a key, he waited about fifteen minutes for Ms. Scott to arrive. When she did, she stated that she had been to collect the money for the band which consisted of over one thousand dollars in cash. She was the bookkeeper for the band and this was a part of her regular duties. Ms. Scott then fixed a light lunch for herself and the appellant after which the appellant started moving his things out. He went by the Hoover Mall to an A P grocery store and gathered some boxes to use in moving. When he returned to the apartment it was close to 3:00 P.M. It took the appellant about one hour to load his belongings into his automobile.
After packing, the appellant returned to the apartment and took a nap in the back bedroom while Ms. Scott counted and divided the money for the band in the front portion of the apartment.
According to the appellant's own testimony, suddenly he woke up and had the impression that he heard "hammering". He called for "Jill" but received no answer. He then walked into the front of the apartment and "thought" he saw Ms. Scott lying on the floor. Suddenly he was face down on the floor, stunned after having been struck from behind. As the appellant got up he turned and saw a man in Ms. Scott's room down on one knee and propped up against something. The appellant stumbled into the room, the stranger turned around and the appellant either tripped or was knocked down. The stranger left the room and the appellant grabbed him in the hall. A struggle ensued and the appellant realized that the stranger was armed with a pistol. At least two shots were fired during the struggle and the appellant grabbed the gun a couple of times but the stranger jerked it away. However at one time the appellant actually had control of the weapon. At that point he was knocked to the floor and almost lost consciousness or did, and he testified that it seemed as if he had a rag or a jacket over his head.
When the appellant got up he crawled over to Ms. Scott and noticed that she "didn't look right"; that something was "terribly wrong". The appellant screamed at her and then realized that she was dead. He testified that at that time he heard a car in the parking lot, jumped up and ran down the stairs. Although the appellant did not see the car, he got in his own car to give chase but discovered that he did not have his keys. He went back to the apartment and tried to get Ms. Scott to talk to him. From this point on the appellant testified that his memory fades and he has little, if any, recall of the events that followed.
On March 27, 1975, the day of the murder, Deputy William Bradford Miller of the Jefferson County Sheriff's Department was working the information desk at the county jail. At approximately six o'clock that evening he noticed the appellant come across the hall from the sheriff's office. The Jefferson County Sheriff's Office first learned of the death of Ms. Scott and the location of the body from information supplied by the appellant.
Upon investigation, Ms. Scott's body was found lying in the front portion of her apartment. A .22 caliber Colt automatic *Page 662 
target pistol lay across the room on the floor. Ten ejected bullets and spent shell casings were found scattered throughout the apartment. One slug was discovered lodged in the door frame of a bedroom. In Ms. Scott's purse was found one hundred sixty-three dollars and some odd change. One thousand one hundred seventy-three dollars and thirty-seven cents lay on a table near the body.
Expert testimony established that Ms. Scott sustained six gunshot wounds: one was located six inches below the navel in the middle of the abdomen near the pubic mount and five were to the head. A "slit-type wound" on the inside of her right hand in the palm and a wound in the outside of her left thumb were classified as "defense-type" wounds. Ms. Scott also sustained a laceration "up in the hair" and a bruised area on her right knee and right leg and "some skin burns which apparently were the type caused by a bullet just grazing the skin on the left side of her chest". Time of death was estimated to be 2:45 P.M., March 27, 1975, although the actual time of death could possibly range from noon until 5:30 in the evening.
The murder weapon belonged to the father of the appellant who could not remember the last time he saw the weapon. Nine latent fingerprints were found on the pistol. One print was determined to be identical to the appellant's. No other prints were identifiable.
Deputy James A. Howell was an evidence technician for the Jefferson County Sheriff's Department. He matched the fingerprints and testified that he had known the appellant for about eight years. Deputy Howell testified that around the 28th or 29th of March he had two or three conversations with the appellant in the jail. The appellant never told him that he shot Ms. Scott but stated that "he should be dead", that he "couldn't stop him or something like that". Howell also stated that the appellant had a wound in the palm of his right hand which appeared to be from the rear sight of the pistol.
Witnesses for both the state and the defense testified that the appellant did not like guns. The following witnesses testified that the appellant had a good general reputation, a good reputation for truth and veracity, for nonviolence and that they would believe him under oath: Deputy Howell; Miss Jan Webber, Ms. Scott's sister; Mr. O.C. (Tex) Harmon, Secretary-Treasurer, business representative of the Birmingham Musicians Union, Local 256; Mr. Dennis Washburn, night city editor and night club columnist for the Birmingham News; Ms. Linda Pardue, employee of First Alabama Bank who once dated the appellant; and Gail Mayfield, legal secretary.
 I
The appellant contends that the state did not prove the voluntariness of his confession and that therefore his confession should not have been admitted into evidence.
The appellant voluntarily went to the Jefferson County Jail. Apparently the first person he encountered was a radio operator for the Sheriff's Department. She took him to Deputy Miller who was working at the front information desk. When Miller first saw him, the appellant was mumbling to himself and repeating over and over again that he had "done something terrible". Miller heard the appellant say this at least three times. At this point, the appellant was crying and shaking; he was "real emotional", would not answer the deputy's questions and did not appear to realize what was being said to him. The appellant would not or could not tell Deputy Miller his name. While the appellant did not express any fear he was "extremely upset".
Because of the mumbling, Deputy Miller contacted Detective Gardner and told him that the appellant "says he's done a bad thing and wants to talk to somebody". Gardner testified that he first saw the appellant around 6:00 P.M. and while the appellant's eyes were tear-stained and inflamed, he was well dressed and of "fairly neat appearance". Although the appellant was nervous and upset he wasn't uncontrollable but did "ramble more than a normal person". *Page 663 
Detective Gardner took the appellant to his office, identified himself as a detective sergeant and showed the appellant his badge and identification card. Gardner asked the appellant if he had a drug problem and the appellant answered "No". After a pause, the appellant remarked that his car was parked outside and he was afraid that it would be pulled away because it was on a parking meter. Gardner told the appellant to tell him what his problem was and he would listen. When Gardner attempted to obtain the appellant's name the appellant "fumbled around" in his pockets and pulled out a musician's union card and a driver's license. The appellant asked Detective Gardner to do him a favor and lock him up.
In response to questions by Detective Gardner, the appellant stated that he had been married until the day before, was a musician and worked in a night club but had been out of work for about two months; the appellant stated that his wife was Jill Scott, a night club entertainer, and that "something happened to her".
At this point, Detective Gardner "got the feeling that (he) might advise him of his rights because (he) didn't know what might have happened to her". The appellant was then orally advised of his rights but was not asked to sign a written waiver. Neither was he asked if he understood his rights.
After being advised of his rights, the appellant sat in the office and sobbed for a few minutes. Then he asked if he could write a note. Upon being handed pen and paper, the appellant wrote:
"Father, Mother Brother.
 Forgive me please. I don't know what I'm doing anymore.
Jimmy."
The appellant stated that he "just couldn't take this anymore" and said that "Jill's dead". Detective Gardner then asked the appellant if he wanted to tell what happened.
The appellant stated that they had been having money problems and arguing over them and that he had even cut off his beard in order to find employment. The appellant told Detective Gardner that they had argued that day and gave him a key to her apartment. Gardner learned that Ms. Scott was in the apartment and the appellant gave him the address and said that it did not happen long ago. He stated that he couldn't stand for someone else to walk in and find her; that they were sure to come looking for her because she had the money. The appellant told Gardner that she had died from a gunshot and that she wasn't very pretty. Detective Gardner then carried the appellant back to the Warden's Office and told Deputy Miller to keep an eye on him while he went to investigate. Deputy Miller testified that Detective Gardner questioned the appellant for about thirty minutes and that when Gardner brought him back out the appellant appeared to be "calming down a bit . . . not quite as emotional and upset . . . not mumbling to himself as much".
Detective Gardner testified that he thought the appellant was capable of knowingly discussing the issues and that he fully understood the rights he was given; that while the appellant was sobbing and shaking (just a little) he did seem to "comprehend or understand or know where he was or what was happening". The appellant's answers were responsive to the detective's questions.
Detective Gardner testified that it became an interrogation on his part "just when he (the appellant) said that something had happened to her". Although he asked if Ms. Scott was shot, he never asked the appellant if he did it because he "didn't know that (he), in fact, had a homicide".
The initial statements of the appellant upon his entrance into the jail until he told Detective Gardner that something had happened to Ms. Scott are not within the coverage ofMiranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694
(1966). The procedural safeguards provided in Miranda are required only when the confessing person is taken into custody and questioned. Miranda, 384 U.S. 436, 86 S.Ct. at 1602. *Page 664 
 "In dealing with statements obtained through interrogation, we do not purport to find all confessions inadmissible. Confessions remain a proper element in law enforcement. Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence. The fundamental import of the privilege while an individual is in custody is not whether he is allowed to talk to the police without the benefit of warnings and counsel, but whether he can be interrogated. There is no requirement that police stop a person who enters a police station and states that he wishes to confess to a crime, or a person who calls the police to offer a confession or any other statement he desires to make. Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today." Miranda, 384 U.S. at 478, 86 S.Ct. at 1630.
We need not determine at what point, if any, the custodial interrogation of the appellant began or whether the Miranda
warning was necessary. When the appellant gave Detective Gardner mere suspicion to suspect that a crime may have been committed, the detective informed the appellant of his constitutional rights. Based upon the facts presented in this case, it is our finding that the appellant waived his right to remain silent and his admissions were voluntary.
The totality of the circumstances determine whether an accused has knowingly and intelligently waived his rights to remain silent and to have counsel. Miranda, supra; Gamble v.State, 48 Ala. App. 605, 266 So.2d 817 (1975). While all extrajudicial confessions are prima facie involuntary and can be rendered admissible only by showing that an "express and affirmative" waiver was given, there is no set pattern or manner for a waiver. Lloyd v. State, 45 Ala. App. 178,227 So.2d 809 (1969). While a waiver will not be presumed simply from the silence of the accused after the warnings are given or simply from the fact that a confession was obtained, where the totality of the circumstances indicate that the confession was voluntary, a confession will not be excluded because the accused did not state that he understood his rights or did not sign a written waiver.
 "Any clear manifestation of a desire to waive is sufficient. The test is the showing of a knowing intent, not the utterance of a shibboleth. The criterion is not solely the language employed but a combination of that articulation and the surrounding facts and circumstances." Lloyd, 45 Ala. App. at 184, 227 So.2d at 814.
After the appellant was warned of his constitutional rights he was not questioned. The appellant himself initiated the continuation of his "interrogation" by asking for a pen and paper and writing a note requesting forgiveness. An inference of a waiver may be drawn from the making of a statement after warnings have been given and when the defendant was aware of his right not to speak. Mitchell v. United States, 140 U.S.App.D.C. 209, 434 F.2d 483, cert. denied, 400 U.S. 867,91 S.Ct. 109, 27 L.Ed.2d 106 (1970).
From a review of the totality of the circumstances it is our conclusion that the confession was voluntary and properly admitted at trial. Factors we have considered in addition to those mentioned above include the facts that no more information was elicited from the appellant than he chose to volunteer; that the appellant was not questioned to produce an incriminating statement; that his statement was not recorded; that the questions were not accusatory but were investigatory and designed to elicit information as to whether a crime had been committed and not who had committed it; that the police were unaware that any crime had been committed when the appellant voluntarily presented himself at the jail; that the appellant was just questioned long enough for the detective to discover if and where a crime may have been committed; that the appellant never admitted and was never asked if he shot Ms. Scott; and the lack of pressure and compulsion employed in the questioning. In short, the appellant expressed a desire to *Page 665 
talk and his statements were obtained without prod or promise from the sheriff.
The appellant correctly recognizes that the mental and emotional state of the accused will not in and of itself vitiate an otherwise knowing and intelligent waiver. The mental condition of the accused must be considered along with other circumstances in determining whether a confession is involuntary. Any testimony that an accused was not in full possession of his mental faculties when the confession is made does not render it inadmissible but only affects the weight to be accorded it by the jury. Breen v. State, 53 Ala. App. 588,302 So.2d 562 (1974); Lokos v. State, 278 Ala. 586,179 So.2d 714 (1965).
 II
The second and final contention of the appellant is that the trial court erred in denying his motion for a mistrial upon testimony by Detective Gardner that the appellant exercised his right to remain silent and would not make a statement.
On redirect examination of Detective Gardner the prosecution asked if the detective asked the appellant whether or not he shot Ms. Scott. Detective Gardner replied:
 "No, sir. After the time we found there was a body there and in fact a person had been murdered or killed, the only time we attempted to talk with Mr. Sullivan was when we came in late that night and we were advised he would not make any statement."
Defense counsel then interposed a general objection and moved for a mistrial without assigning any grounds. The trial court overruled the motion for a mistrial and sustained the objection.
The prosecution may not use at trial the fact that the accused elected to exercise his privilege against self-incrimination in the face of custodial interrogation.Miranda, supra. The statement by Detective Gardner that he had been advised that the appellant would not make any statements was improper and not responsive. However it was not ineradicable. Generally see 6 Alabama Digest, Criminal Law, 407; 8 A.L.R.2d 1013, Annotation: Effect of voluntary statements damaging to accused, no proper subject of testimony, uttered by testifying police or peace officer. Because the statement was eradicable the trial judge correctly overruled the motion for a mistrial. The court was correct in sustaining the objection. The court was not under a duty to exclude the statement ex mero motu and there was no motion to exclude or curative instructions requested by defense counsel. Therefore the action of the court in overruling the motion for mistrial and in failing to exclude the unresponsive answer on its own motion was not reversible error. Carroll v. State, 45 Ala. App. 92, 225 So.2d 198, cert. denied, 284 Ala. 727, 225 So.2d 200
(1969).
This court has carefully reviewed and searched the record on appeal for error prejudicial to the substantial rights of the appellant. We have found no errors and therefore it is our opinion that the judgment of the lower court is due to be affirmed.
AFFIRMED.
All Judges concur.