James SULLIVAN, Jr.,
Petitioner-Appellant,

v.

STATE OF ALABAMA,
Respondent-Appellee.

No. 80–7380.

United States Court of Appeals,
Eleventh Circuit.

Jan. 22, 1982.

Rehearing Denied Feb. 26, 1982.

Robert R. Bryan, San Francisco, Cal., for petitioner-appellant.

Jean Williams Brown, Asst. Atty. Gen., Montgomery, Ala., for respondent-appellee.

Before TUTTLE, HENDERSON and HATCHETT, Circuit Judges.

HENDERSON, Circuit Judge:

James H. Sullivan, Jr., the petitioner-appellant, appeals the decision of the United States District Court for the Northern District of Alabama denying his petition for a writ of habeas corpus. 28 U.S.C. § 2254. He asserts that his trial in the Alabama state court was constitutionally flawed by the admission into evidence of his statements made to police officers and by comments of the prosecution at trial. After reviewing the record, we find no error and affirm the district court.

At approximately 6:00 p.m. on March 27, 1975, James Sullivan walked into the Jefferson County jail in Birmingham, Alabama. Deputy W. B. Miller of the Jefferson County Sheriff's Office was working at the front information desk. When Miller saw him, the petitioner was mumbling and repeating to himself, "I have done something terrible, it is awful." Trial Transcript at 59, *Alabama v. Sullivan*, No. 34264 (10th Judicial Circuit Court for Jefferson County, Dec. 11, 1975) (hereinafter referred to as "Trial Transcript"). Petitioner repeated this statement several times and was obviously very upset, distraught and emotional. Miller asked Sullivan his name and the nature of his problem, but Sullivan did not answer. Deputy Miller then summoned Sgt. Joseph Gardner. When Sgt. Gardner arrived, Miller related his previous conversation with Sullivan and stated that Sullivan had requested to talk to someone. Trial Transcript at 56. Gardner then ushered Sullivan into his office, and, without initially advising Sullivan of his *Miranda* rights, began to converse with the petitioner. *See Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The following account of the exchange between Gardner and Sullivan appears in the opinion of the Alabama Court of Criminal Appeal:

Detective Gardner took the appellant to his office, identified himself as a detective sergeant and showed the appellant his badge and identification card. Gardner asked the appellant if he had a drug problem and the appellant answered "No". After a pause, the appellant remarked that his car was parked outside and he was afraid that it would be pulled away because it was on a parking meter. Gardner told the appellant to tell him what his problem was and he would listen. When Gardner attempted to obtain the appellant's name the appellant "fumbled around" in his pocket and pulled out a musician's union card and a driver's license. The appellant asked Detective Gardner to do him a favor and lock him up.

In response to questions by Detective Gardner, the appellant stated that he had

been married until the day before, was a musician and worked in a night club but had been out of work for about two months; the appellant stated that his wife was Jill Scott, a night club entertainer and that "something happened to her".

At this point, Detective Gardner "got the feeling that (he) might advise him of his rights because (he) didn't know what might have happened to her". The appellant was then orally advised of his rights but was not asked to sign a written waiver. Neither was he asked if he understood his rights.

After being advised of his rights, the appellant sat in the office and sobbed for a few minutes. Then he asked if he could write a note. Upon being handed pen and paper, the appellant wrote:

"Father, Mother & Brother,
Forgive me please.
I don't know what
I'm doing anymore.
    Jimmy."

The appellant stated that he "just couldn't take this anymore" and said that "Jill's dead". Detective Gardner then asked the appellant if he wanted to tell what happened.

The appellant stated that they had been having money problems and arguing over them and that he had even cut off his beard in order to find employment. The appellant told Detective Gardner that they had argued that day and gave him a key to her apartment. Gardner learned that Ms. Scott was in the apartment and the appellant gave him the address and said that it did not happen long ago. He stated that he couldn't stand for someone else to walk in and find her; that they were sure to come looking for her because she had the money.[1] The appellant told Gardner that she

had died from a gunshot and that she wasn't very pretty. Detective Gardner then carried the appellant back to the Warden's Office and told Deputy Miller to keep an eye on him while he went to investigate. Deputy Miller testified that Detective Gardner questioned the appellant for about thirty minutes and that when Gardner brought him back out the appellant appeared to be "calming down a bit ... not quite as emotional and upset ... not mumbling to himself as much".

*Sullivan v. State*, 351 So.2d 659, 663 (Ala.Cr. App.1977) (footnote added).[2] Sgt. Gardner and other investigators then proceeded to the apartment where they found the dead body of Sullivan's wife. She had been shot six times. A target pistol, belonging to the petitioner's father, was on the floor. It was later determined to be the murder weapon. Several fingerprints were lifted from the weapon, one of which was identified as that of Sullivan. At the trial, the petitioner offered an exculpatory story in his defense. Record at 140. *See Sullivan v. State*, 351 So.2d at 661.

Sullivan was charged with first degree murder. Prior to the trial, he was transferred to a mental hospital for four months. After a jury trial in the Circuit Court for the Tenth Judicial Circuit of Alabama, he was convicted of first degree murder and sentenced to life imprisonment. His unsuccessful appeal followed, *Sullivan v. State*, 351 So.2d 659 (Ala.Cr.App.1977), and both his request for a rehearing and petition for certiorari to the Alabama Supreme Court were denied. *Ex parte Sullivan*, 351 So.2d 665 (Ala.1977). The United States District Court for the Northern District of Alabama subsequently denied Sullivan's petition for a writ of habeas corpus, 28 U.S.C. § 2254. He then filed a notice of appeal to this court.

---

1. This is a reference to the fact that, before her death, Jill Scott had collected money for her band. She was the bookkeeper for the band and this was one of her regular duties. When the police discovered her body, more than $1,000.00 was on a table in the room.

2. At the trial, the judge first held hearings outside the presence of the jury to determine the admissibility of Sullivan's pre- and post-*Miranda* statements. The court overruled the defense motion to suppress the statements. The jury then returned and the testimony concerning Sullivan's statements was elicited. Record at 142.

■ Sullivan first alleges that the admission into evidence of the various pre-*Miranda* statements was error because (1) he was in custody at the beginning of the questioning and (2) the statements were involuntary by reason of his mental incompetence. In *Miranda v. Arizona*, the Supreme Court held that evidence obtained as a result of a custodial interrogation was inadmissible unless the defendant had first been warned of his rights and knowingly waived those rights. 384 U.S. at 444–5, 86 S.Ct. at 1612, 16 L.Ed.2d at 706–7. However, the protections of *Miranda* do not extend to voluntary statements made to law enforcement officers. As the Supreme Court stated in *Miranda*,

> [a]ny statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence. The fundamental import of the privilege while an individual is in custody is not whether he is allowed to talk to the police without the benefit of warnings and counsel, but whether he can be interrogated. There is no requirement that police stop a person who enters a police station and states that he wishes to confess to a crime, or a person who calls the police to offer a confession or any other statement he desires to make. Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today.

384 U.S. at 478, 86 S.Ct. at 1629, 16 L.Ed.2d at 726 (footnote omitted). In *United States v. Savell*, 546 F.2d 43, 46 (5th Cir. 1977), the Fifth Circuit Court of Appeals reiterated this view in stating that the *Miranda* rule "does not reach a situation ... where the statements were unsolicited, spontaneous and freely made prior to any attempted interrogation." Sullivan walked into the sheriff's office of his own free will. Any comments or declarations made at that time were clearly volunteered and not the result of a custodial interrogation. Thus, the *Miranda* rule was inapplicable and no warning was required.

■ Likewise, the statements made by Sullivan while he was in Sgt. Gardner's office were voluntary and not the product of a custodial interrogation. The *Miranda* Court defined custodial interrogation as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." 384 U.S. at 444, 86 S.Ct. at 1612, 16 L.Ed.2d at 706. A custodial interrogation is to be distinguished from the "traditional investigatory functions" of police where the compulsive atmosphere triggering *Miranda* is absent. *See Miranda*, 384 U.S. at 477–78, 481, 86 S.Ct. at 1629, 1631, 16 L.Ed.2d at 725–7; *United States v. Montos*, 421 F.2d 215 (5th Cir.), *cert. denied*, 397 U.S. 1022, 90 S.Ct. 1262, 25 L.Ed.2d 532 (1970). The pre-*Miranda* conversation between Sgt. Gardner and the petitioner does not reveal any of the significant restraint of freedom characteristic of a custodial interrogation. Sgt. Gardner had no indication of the commission of a crime. In fact, he suspected that Sullivan might have a drug problem. His initial inquiry was merely an attempt to investigate and probe the situation. Sullivan was not under arrest; he remained at the station of his own accord and freely answered the questions asked of him.

■ As the second prong of this argument, Sullivan insists that the pre-*Miranda* statements were involuntary because of his mental incompetency or insanity. It is settled that statements or confessions made during a time of mental incompetency or insanity are involuntary and, consequently, inadmissible. *Townsend v. Sain*, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963); *Blackburn v. State*, 80 S.Ct. 274, 361 U.S. 199, 4 L.Ed.2d 242 (1960). In deciding the ultimate issue of voluntariness, though, we may substitute our independent judgment after a review of the entire record. *Jurek v. Estelle*, 623 F.2d 929 (5th Cir. 1980), *cert. denied*, 450 U.S. 1001, 101 S.Ct. 1709, 68 L.Ed.2d 203 and 450 U.S. 1014, 101 S.Ct. 1724, 68 L.Ed.2d 214 (1981). *See Beckwith v. United States*, 425 U.S. 341, 96 S.Ct. 1612, 48 L.Ed.2d 1 (1976); *Brown v. Allen*, 344 U.S. 443, 507, 73 S.Ct. 397, 434, 97 L.Ed. 469 (1953) (opinion of J. Frankfurter). Voluntariness is premised on the totality of the

circumstances. *Blackburn v. State*, 361 U.S. at 206, 80 S.Ct. at 279, 4 L.Ed.2d at 248. In this case, there is no persuasive evidence or strong probability of Sullivan's insanity. *See Blackburn v. State*, 361 U.S. at 207, 209, 80 S.Ct. at 281, 4 L.Ed.2d at 248, 250, (compelling evidence and strong probability of insanity demonstrated the involuntariness of the confession). No medical evidence of the petitioner's insanity was presented during the trial or on the petition for habeas corpus.[3] He relies solely on the affidavits of his mother, his attorney, a psychiatric social worker and a maintenance worker who was at the jail at the time of his arrival. These people, three of whom observed Sullivan after his conversations with Miller and Gardner, described him as being upset, depressed and confused. Nonetheless, the district court did not give great weight to these affidavits. Record at 144. Sgt. Gardner, the one who actually questioned Sullivan, testified that he was very excited and disturbed, but, nevertheless, was coherent and responsive to questions. Trial Transcript at 14–15, 37. Mere emotionalism and confusion do not dictate a finding of mental incompetency or insanity. Inasmuch as no *Miranda* warnings were required and since the pre-*Miranda* statements were voluntary, there was no constitutional error in their admission.

▉▉▉ The second claim of error focuses on the statements made after Sullivan was advised by Sgt. Gardner of his *Miranda* rights. If interrogation continues without an attorney after the defendant has been warned, the government must show that the defendant made a knowing, voluntary, and intelligent waiver of his rights. *Miranda v. Arizona*, 384 U.S. at 475, 86 S.Ct. at 1628, 16 L.Ed.2d at 724. When Sgt. Gardner surmised that a crime might have been committed, he advised Sullivan of his *Miranda* rights. The petitioner waited several minutes and then resumed the conversation by asking to write a note. Sgt. Gardner then asked more questions, although he

never formally arrested Sullivan. In *United States v. Savell*, 546 F.2d at 45–6, the defendant was under arrest and received an incomplete *Miranda* warning. Afterwards, the defendant began a conversation with the police. The Fifth Circuit Court of Appeals viewed the statement as spontaneous and refused to find that this sequence of events constituted a custodial interrogation. Thus, *Miranda* was not controlling and despite the inadequate warning the statements were admissible. Comparing the facts of *Savell* with those here, it is evident that no custodial interrogation ever materialized. Therefore, there was no necessity for a *Miranda* warning.

▉▉▉ But even if the sequence of events following the *Miranda* warning could be characterized as a custodial interrogation, it is apparent that Sullivan voluntarily and knowingly waived his rights. Whether a valid waiver of constitutional rights was made is a question of law for consideration on appeal. *Brewer v. Williams*, 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977). Although a waiver cannot be presumed from a silent record, *Miranda*, 384 U.S. at 475–6, 86 S.Ct. at 1628, 16 L.Ed.2d at 724, it need not be explicit and can be inferred from the totality of the circumstances. *North Carolina v. Butler*, 441 U.S. 369, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979); *United States v. Cavallino*, 498 F.2d 1200, 1204 (5th Cir. 1974); *United States v. Montos*, 421 F.2d 215 (5th Cir.), *cert. denied*, 397 U.S. 1022, 90 S.Ct. 1262, 25 L.Ed.2d 532 (1970). The conduct of the accused is only one factor in evaluating the validity of a waiver. *See Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938). Sullivan was obviously emotional and distraught during the questioning. However, the Alabama Court of Criminal Appeal found the other circumstances to include

> the facts that no more information was elicited from the appellant than he chose to volunteer; that the appellant was not

---

**3.** Sullivan did spend four months in a mental hospital prior to his trial. However, there is no evidence in the record supporting the claim of insanity or elaborating on his stay at the institution.

questioned to produce an incriminating statement; that his statement was not recorded; that the questions were not accusatory but were investigatory and designed to elicit information as to whether a crime had been committed and not who had committed it; that the police were unaware that any crime had been committed when the appellant voluntarily presented himself at the jail; that the appellant was just questioned long enough for the detective to discover if and where a crime may have been committed; that the appellant never admitted and was never asked if he shot Ms. Scott; and the lack of pressure and compulsion employed in the questioning. In short, the appellant expressed a desire to talk and his statements were obtained without prod or promise from the sheriff.

After a review of the record, we agree with the Alabama appellate court and the district court that Sullivan made a knowing, voluntary, intelligent waiver of his constitutional rights.

Finally, Sullivan complains of improper prosecutorial comment on his choice to remain silent, in disregard of his rights under the Fourteenth Amendment. This ground of error finds its support in *Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), in which the Supreme Court held that due process proscribes comment or reference to a defendant's silence as evidence of guilt or for impeachment purposes. In *Doyle* the prosecution's comment on the defendant's silence occurred during the cross-examination of the defendant. In this case, Sullivan objects to the initial segment of the prosecutor's re-direct examination of Sgt. Gardner. In the cross-examination of Gardner, defense counsel elicited the fact that Sullivan had never actually admitted killing his wife. Then, on re-direct examination by the state prosecuting attorney, the following exchange took place:

Q. But he never did say he didn't do it, did he?

A. No, sir.

Q. You asked, didn't you?

A. No, sir. After the time we found there was a body there and in fact a person had been murdered or killed, the only time we attempted to talk with Mr. Sullivan was when we came in late that night and we were advised he would not make any statement.

Q. You were advised he would not make any statement?

A. Yes, sir, Sgt. Swatek—

Trial Transcript at 52–53.[4] Sullivan's attorney immediately objected and moved for a mistrial. The court overruled the motion for a mistrial but sustained the objection. *Id.* Defense counsel made no request for curative instructions and none were given by the court. *Sullivan v. State*, 351 So.2d at 665. There was no further reference to Sullivan's silence during the remainder of the trial.

■ The state maintains there was no *Doyle* violation. Since Sullivan had not testified at the time Gardner was examined, the state asserts that the testimony could not have been used for impeachment, as was the case in *Doyle*. The state also emphasizes the fact that the objection was sustained. The district court expressed an inclination to agree with the state. Record at 148–9. In *Chapman v. United States*, 547 F.2d 1240, 1242 (5th Cir.), *cert. denied*, 431 U.S. 908, 97 S.Ct. 1705, 52 L.Ed.2d 393 (1977), the defendant had yet to be called as a witness when the prosecutor asked the investigating officer if the defendant had said anything after receiving the *Miranda* warning. The Fifth Circuit Court of Appeals found that these facts constituted a *Doyle* violation. Viewing the transcript in its true light, *see* footnote 4, we note that

4. The parties' briefs reflect disagreement as to the exact content of this testimony. The appellant's brief recounts the redirect examination as described here. Counsel for the state does not mention the last question propounded by the prosecutor (*i.e.* "You were advised he would not make any statement?"), and states

that the objection was made immediately after the witness's longer answer. The state appellate court and the district court agreed with the appellee's account of the testimony. However, the actual trial transcript discloses that the appellant's version is correct.

the prosecutor repeated and emphasized Sullivan's refusal to make a statement. Such conduct, whether inadvertent or otherwise, constitutes a departure from the *Doyle* mandate.

In spite of this transgression, we are required to apply the harmless error standard. *See e.g., United States v. Dixon,* 593 F.2d 626 (5th Cir.), *cert. denied,* 444 U.S. 861, 100 S.Ct. 126, 62 L.Ed.2d 82 (1979); *United States v. Meneses-Davila,* 580 F.2d 888 (5th Cir. 1978); *Chapman v. United States,* 547 F.2d at 1247–8; *United States v. Davis,* 546 F.2d 583 (5th Cir.), *cert. denied* 431 U.S. 906, 97 S.Ct. 1701, 52 L.Ed.2d 391 (1977). In *Chapman,* the court attempted to establish categories of *Doyle* violations in an effort to weigh the effect of error. *Chapman v. United States,* 547 F.2d at 1249–50. Subsequent cases acknowledge that some situations do not neatly fall into one of the *Chapman* types, and thus the determination of harmless error must be made on a "case by case basis." *United States v. Dixon,* 593 F.2d at 629; *United States v. Meneses-Davila,* 580 F.2d at 890; *United States v. Davis,* 546 F.2d at 594–95 n. 31. "The decision requires an examination of the facts, the trial context of the error, and the prejudice created thereby as juxtaposed against the strength of the evidence of defendant's guilt." *United States v. Meneses-Davila,* 580 F.2d at 890. With these guidelines in mind, we conclude that the *Doyle* violation in this case was harmless error. Sullivan had not yet testified and the prosecutor could not have directly related Gardner's testimony to the petitioner's story for impeachment purposes. After this one reference, there was no further mention of Sullivan's silence. It could be said that the comment by the witness was not necessarily an observation of Sullivan's exercise of his constitutional right, but merely a statement that he didn't want to discuss the matter. *See United States v. Dixon,* 593 F.2d at 629–30 (five-point analysis for a determination of harmless *Doyle* error). Morever, in light of the many incriminating statements made by Sullivan, there was strong evidence of his guilt. The objection was sustained and even though the trial court gave no curative instructions, no request was made. Accordingly, the failure to grant a mistrial was harmless error.

The judgment of the district court denying the writ of habeas corpus is

AFFIRMED.