George Payne was indicted for burglary in the third degree in violation of § 13A-7-7, Code of Alabama 1975. The appellant was found "guilty as charged in the indictment" and the trial judge sentenced him to ten years' imprisonment in the penitentiary, but specified that the appellant serve one year in prison and five years on probation.
On September 7, 1977, the Rollins Protective Service installed a burglar alarm system in the home of Charles Crawford Williams, Jr. The system is one that activates when a door or window is opened, and after a time delay, the police are alerted.
Larry Wyatt, an expert on alarm systems and a master service technician for Rollins testified that only a person familiar with a Rollins system would know how to disengage the Williams' alarm system.
The appellant began working for Rollins on January 23, 1978, and was employed there until September, 1980.
Mr. Williams testified that when the system needed servicing, he would request that the appellant do the work. However, according to records supplied by Rollins, the appellant made only two of eighteen service calls to the Williams' home between the time the system was installed and one month prior to the burglary in question. The appellant testified he serviced the Williams' system approximately five times during this period.
Mr. Williams testified the appellant installed another alarm system inside a closet where Williams' antique gun collection was kept (valued between $20,000 to $25,000). The appellant denied installing the system.
On April 29, 1981, Mr. Williams turned on the alarm system in his home, and left for work around noon on that day. A neighbor, Cathy Yates, drove by the Williams' home and saw a man whom she identified as the appellant standing in the driveway.
Mr. and Mrs. Williams arrived home around 5:00 p.m. on that day and discovered their home had been burglarized. The door to the closet where the guns were kept had been smashed and was wide open. All of the guns and certain other valuables kept in the closet were gone. However, two of the guns were found in the hallway and in the bedroom. A small Sony television was also missing.
Mr. Williams discovered someone had cut the telephone line, thereby rendering the alarm system inoperative. The back door lock had been opened with a crow bar. The *Page 724 
front panel of the alarm control box was unlocked and the power module had been removed and placed on top of the unit. Only Rollins personnel had keys to unlock the panel to the control box.
The appellant and his wife were arrested on May 20, 1981, charged with the burglary of the Williams' home and transported to the Mountain Brook city jail in separate patrol cars. Officer Keely read the appellant his Miranda rights in the patrol car soon after his arrest. Keely testified he did not ask the appellant any questions in the patrol car and the appellant did not say anything. However, the appellant testified he told Keely he did not want to talk.
Upon their arrival at the jail, the appellant was taken to a cell and the officers questioned his wife about the burglary. Around 5:00 p.m., Officer Keely brought the appellant into the office and again read him his rights in the presence of Mrs. Payne and Officer Issics. The appellant refused to sign a waiver. All charges against Mrs. Payne were dropped two weeks later. The appellant denied he was read his rights at this time.
The appellant asked for his attorney and Keely gave him the telephone book. He did not reach the attorney at this time but later, the attorney did call the appellant and the appellant talked with him. The appellant then asked to speak to his wife, alone, which he was allowed to do. The two were placed in cells next to each other.
At approximately 7:00 p.m., Officer Keely received a message that the appellant wanted to talk to him. He brought the appellant into the office and the appellant told Keely he wanted to talk. Keely did not re-read the appellant his Miranda
rights since he had done this an hour and a half before.
Keely testified the appellant said, "Suppose that I could get the guns back, will you get a statement signed by a District Attorney saying you won't prosecute the case?" When Keely answered "no", the appellant said, "Well, I couldn't get them back anyway." (R. 188-190). Keely asked the appellant if anyone else was involved, and the appellant told him he wouldn't tell him. (R. 192). The appellant's statement was not written down and Keely did not remember it until the day of the trial.
Officer Issics corroborated Keely's testimony concerning the details of this conversation, and that the appellant initiated the meeting. The appellant claimed the officers brought him in and offered him a deal.
The appellant was moved to the Jefferson County jail a week later. Keely and Issics went to see the appellant at that jail, read him his Miranda rights and questioned him again. No statements were obtained during this visit.
 I
The appellant contends he did not knowingly, intelligently and voluntarily waive his right to remain silent and therefore, reversible error was committed when the trial court admitted into evidence statements made by the appellant after he had requested to talk to an attorney.
We must agree with the appellant that once an accused asks to remain silent or requests an attorney, all questioning of that accused must cease at that point. Miranda v. Arizona,384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). However, "an accused . . . having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him unless
the accused himself initiates further communication, exchanges or conversations with the police." (Emphasis added). Edwards v.Arizona, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981).
If an accused initiates a meeting with the police at which he gives a statement, then "nothing in Fifth and Fourteenth Amendments would prohibit the police from merely listening to his voluntary, volunteered statements and using them against him at the trial." Edwards v. Arizona, supra.
The United States Supreme Court stated in Edwards v. Arizona, supra:
 "Absent such interrogation, there would have been no infringement of the right . . . invoked and there would be no occasion to determine whether there had been a valid waiver." *Page 725 
There was sufficient testimony elicited at the trial to allow this court to reasonably conclude that it was the appellant, not the police, who initiated the meeting at which the appellant made the incriminating statement.
Even though the U.S. Supreme Court does not require this court to determine if there has been a valid waiver (because there was not an interrogation), we will examine this issue.
 "A waiver is ordinarily an intentional relinquishment of a known right or privilege. The determination of whether there has been an intelligent waiver . . . must depend, in each case, upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused."
Edwards v. Arizona, supra. Even though the appellant was not read his rights prior to the beginning of this conversation on the night of his arrest, he had been fully apprised of those rights on two previous occasions, one of which occurred only an hour and a half before this particular conversation.
This court has held that once an accused has been informed of his Miranda rights, they do not need to be repeated at each successive interview. Love v. State, 372 So.2d 414 (Ala.Cr.App. 1979), Gibson v. State, 347 So.2d 576 (Ala.Cr.App. 1977).
Looking at the fact that the appellant requested the meeting with the police, had been read his rights on two prior occasions that day and knew what his rights were because he invoked his right to remain silent and his right to consult counsel, we believe, after examining the totality of the circumstances, that the appellant did knowingly, intelligently and voluntarily waive his constitutional rights to remain silent and have counsel present during this interrogation. Therefore, the appellant's statement was properly admitted into evidence.
 II
The appellant claims the State's evidence was insufficient to support a conviction.
In Cumbo v. State, 368 So.2d 871 (Ala.Cr.App. 1979), this court held:
 "In reviewing a conviction based on circumstantial evidence, this court must view that evidence in the light most favorable to the prosecution. The test to be applied is whether the jury might reasonably find that the evidence excluded every reasonable hypothesis except that of guilt; not whether such evidence excludes every reasonable hypothesis but guilt, but whether a jury might reasonably so conclude." (Citations omitted).
To sustain a conviction, an accused's guilt need not be established to the "exclusion of every possibility of innocence." Hayes v. State, 395 So.2d 127 (Ala. 1981).
 "The State's evidence should not be stricken out, as insufficient to support a conviction, merely because, when disconnected it is weak and inconclusive, if, when combined, it may be sufficient to satisfy the jury of an accused's guilt."
Whether there is sufficient circumstantial evidence to exclude every other reasonable hypothesis but that of guilt is a question for the jury. Cumbo v. State, supra. This court must not substitute its judgment for that of the jury. Thomas v.State, 363 So.2d 1020 (Ala.Cr.App. 1978); Cumbo v. State, supra. Our duty is to "determine if legal evidence was presented from which the jury, by fair inference could have found the defendant guilty beyond a reasonable doubt." Citations omitted. Thomas v. State, supra.
We have examined the record and believe there was sufficient evidence, presented by the State, to allow the jury to conclude beyond a reasonable doubt, that the appellant was guilty of the crime as charged.
Therefore, the judgment of the trial court is due to be and is hereby affirmed.
AFFIRMED.
All the Judges concur except DeCARLO, J., not sitting, (daughter prosecuted case in Circuit Court). *Page 1288