Appellant, Dewitt Seawright, was indicted by the July 1984 term of the Butler County Grand Jury for the capital murder of Douglas McNaughton. A jury found appellant guilty as charged in the indictment on September 12, 1984. At the sentencing phase the jury recommended that appellant be sentenced to life imprisonment without parole. The trial court subsequently imposed a sentence of life imprisonment without parole. Appellant filed a pro se notice of appeal and trial counsel was appointed to represent appellant on appeal. Three issues are raised on appeal, none of which require a detailed recitation of the facts.
 I
Appellant first contends that the trial court committed prejudicial error in overruling his motion to change venue. At the hearing on this motion appellant offered no evidence as to the extent or content of any media coverage. Appellant called nine witnesses, and only one witness, Ms. Jamie Gulley, unequivocally stated that she did not believe appellant could get a fair trial. A second witness, Ms. Clara Martin, stated she did not think he could get a fair trial, although she had not talked with anyone about the matter. Ms. Martin stated on cross-examination that she felt a jury in Butler County could decide the case based on the evidence. A third witness, Ms. Daisy Hines, stated she did not know if appellant could get a fair trial in Butler County because she did not know what a fair trial was. Eventually Ms. Hines stated that she personally felt appellant was guilty, based on what she had read in the newspaper, although she could not remember what she had read. Finally, Ms. Lucy Davidson stated that she did not know whether appellant could get a fair trial. The remaining witnesses called by appellant stated that they believed he could get a fair trial in Butler County based on the evidence presented. The State then produced five witnesses who testified that, in their opinion, appellant could get a fair trial in Butler County.
The trial court reserved ruling on the change of venue motion until after the jury venire had been questioned. The seventy-eight members of the venire were questioned in panels of twelve. Those who expressed a fixed opinion were stricken from the venire. We note that numerous members of the venire knew, or knew of, the victim, but a larger number did not know the victim. Each panel was asked by defense counsel the following question:
 "Does anybody believe, this is the question I want you to answer the way you really feel and not the way you hope things are, that a black man like Dewitt Seawright would have difficulty in getting a fair trial in Butler County because he's charged with killing a prominent *Page 1364 
white man? Does anybody have any doubt in their mind about that?"
No member of the panels responded affirmatively to this question. We note that the trial court allowed extensive voir dire examination of the venire and liberally excluded members for cause.
The appellant had the burden of proving to the reasonable satisfaction of the trial court that a fair and impartial trial could not be had in Butler County and an unbiased verdict could not be reasonably expected. See Anderson v. State,362 So.2d 1296 (Ala.Crim.App. 1978), and cases cited therein. See alsoMagwood v. State, 426 So.2d 929 (Ala.), cert. denied,462 U.S. 1124, 103 S.Ct. 3097, 77 L.Ed.2d 1355 (1983). "An accused is entitled to a change of venue if he can affirmatively demonstrate to the trial court that the pre-trial publicity has so saturated the community as to have a probable impact on the prospective jurors or that there is a connection between the publicity generated and the existence of actual jury prejudice." Jackson v. State, [Ms. 6 Div. 767, April 9, 1985] (Ala.Crim.App. 1985).
Appellant introduced no evidence of the extent or content of any pre-trial publicity which may have been generated by the case. It is evident from the testimony of the witnesses on the motion to change venue and from the jury venire that accounts of the incident appeared through local media, but no one could remember any specific articles or reports which may have influenced them. As was stated in Jackson:
 "We do not believe that the pre-trial publicity in the case at bar even remotely approaches the magnitude of prejudicial publicity condemned by the Supreme Court in Estes [v. Texas, 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965)], Sheppard [v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600
(1966)], and Irvin [v. Dowd, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961)]. Outside influences had not so infiltrated the community at large as to render the existence of community prejudice against the appellant probable. Here, there was no trial atmosphere `utterly corrupted by press coverage.' Dobbert v. Florida, 432 U.S. [282] at 302 [97 S.Ct. 2290 at 2302-03, 53 L.Ed.2d 344] (quoting Murphy v. Florida, 421 U.S. [794] at 798 [95 S.Ct. 2031, 2035, 44 L.Ed.2d 589])."
We do not here engage in an extensive review of law concerning prejudicial pre-trial publicity because appellant's brief seems to concentrate on the premise that an unknown black man of low economic status cannot get a fair trial in rural Butler County when he is charged with murdering a fairly well known white man who sells insurance and operates a convenience store. Appellant states in his brief:
 "In a small county such as Butler, the jurors generally know each other and do not want to buck the community sentiment and normally favor conviction regardless of the evidence and especially regarding assaultive crimes by blacks against whites there has been a long tradition, particularly in small rural counties, to convict on almost any evidence to serve as a deterrent to blacks."
Such a broad and sweeping contention is totally unsupported by any evidence contained in the record of these proceedings. There was no evidence before the trial court or this court that would support such a theory. Furthermore, we do not consider persuasive appellant's argument that the victim was so beloved in the community that a fair trial would be impossible. Although it is true that thirty-six members of the venire knew, or knew of, the victim or his family, it is also true that forty-two members of the venire did not know the victim or his family. The sole evidence in support of the appellant's contention that he could not receive a fair trial came from the witnesses he called at the hearing on the motion for change of venue. "The mere belief of the defendant or of the witnesses he is able to produce that he cannot receive an impartial trial is not enough to entitle him to a change of venue." Sprinkle v.State, 368 So.2d 554, 558 (Ala.Crim.App. 1978), writ quashed,368 So.2d 565 (Ala. 1979); see also Ellison v. *Page 1365 State, 373 So.2d 1247, 1248 (Ala.Crim.App. 1979).
We have carefully reviewed the testimony of the witnesses produced at the change of venue hearing and the voir dire of the jury venire and conclude that appellant's contentions are wholly without merit. The trial judge properly exercised his discretion in denying appellant's motion for a change of venue. See Fike v. State, 447 So.2d 850 (Ala.Crim.App. 1983).
 II
Appellant next contends that certain statements made by him, while in custody at the Montgomery Police Department, should have been suppressed as being illegally obtained. The State filed a pre-trial motion to determine the admissibility of these statements. A hearing was held on the motion and the trial court found the statements to be admissible at trial.
On May 2, 1984, at approximately 5:40 p.m., Officer L.O. Perdue interrogated appellant at the Montgomery Police Department. Perdue advised appellant of his Miranda rights. A "standard rights form the police department uses" was signed by both appellant and Perdue. Perdue testified that he asked appellant if he understood the rights stated on the form and appellant responded that he did. Perdue testified that he read the form to appellant and then "went over it again and asked him if he understood he could have a lawyer present if he wanted to have one," and Perdue said, "he stated that he would talk to me concerning this case." Another officer was also present during these proceedings. Perdue stated that no threats or promises were made and that appellant made the statement freely and voluntarily. Appellant then told Perdue that Mr. McNaughton had allowed him to use the car to go to the liquor store and told him to take what cash he needed from the cash bag in the car, and that appellant could use the car as long as he needed. Appellant stated he purchased some wine, then went to Montgomery. This statement was not written or recorded.
The parties then stipulated to the following events. At 8:30 p.m. on the same date, Sheriff Worthington of the Butler County Sheriff's Department interviewed appellant. Appellant refused to make a statement and requested an attorney. The Sheriff left as soon as appellant made this request. At 9:15 p.m. Investigator Richard Teague interviewed appellant, advised him of his Miranda rights and took a second oral statement. This second statement was not used at trial and its contents were not part of the stipulation. Teague suggested that appellant make a recorded statement, and he set up video equipment. Appellant then refused to talk and requested an attorney for the second time. No objection was made to these stipulated facts, nor has any argument been raised on appeal concerning the import of Teague's interview with appellant. The stipulation does not inform this court of the circumstances leading up to Teague's interview, or the content of the statements made by appellant as a result of the interview. Having raised no objections and there being no facts in the record concerning this interview, there is nothing for us to review in this regard. The record does disclose that the authorities broke off the interview when appellant requested an attorney.
The State then called Sergeant Donald G. Shaner, of "Vice and Narcotics" with the Montgomery Police Department. Shaner was the shift supervisor on the day in question. According to Shaner, the other officers had gone off on various other duties and he was left to watch appellant. Appellant was being held in a room located "no more than fifteen feet" from Shaner's office. As Shaner was observing appellant around 9:45 p.m., he (Shaner) "took a dip of snuff" and appellant "asked for some." Shaner stated, "I gave him a dip and I put some in an envelope for him also." The next thing said by appellant was "I want to get it off my chest. I did it. It was self defense." Shaner then left the room and instructed Teague to take a statement from appellant. Shaner had no further involvement with appellant. *Page 1366 
As part of the stipulation, referred to previously, it was stated that appellant was properly advised of his Miranda
rights following the Shaner encounter and that a cassette tape was made of the statement appellant made thereafter. These stipulations were made without objection.
Appellant argues that the statements made after the Shaner incident were involuntary because they were obtained after he elected to exercise his constitutional right to confer with an attorney before questioning, relying on Miranda v. Arizona,384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). However, "an accused . . . having expressed his desire to deal with police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to himunless the accused himself initiates further communication,exchanges or conversations with the police." Edwards v.Arizona, 451 U.S. 477, 484-485, 101 S.Ct. 1880, 1884-85,68 L.Ed.2d 378 (1981) (emphasis added). See also Payne v. State,424 So.2d 722 (Ala.Crim.App. 1982). As has been stated in this jurisdiction, "[a]ny person arrested who asserts his right to counsel may later change his mind and voluntarily submit to questioning." Morrison v. State, 398 So.2d 730, 743
(Ala.Crim.App. 1979), rev. on other grounds, 398 So.2d 751
(Ala. 1981) (citations omitted); see also Sales v. State,432 So.2d 560 (Ala.Crim.App. 1983).
Most recently in Oregon v. Bradshaw, 462 U.S. 1039,103 S.Ct. 2830, 77 L.Ed.2d 405 (1983), the Court clarified the Edwards
rule and held that the State must prove (1) that the defendant initiated the dialogue with authorities, id. at 1044,103 S.Ct. at 2834, and (2) that the waiver of his right to counsel and to remain silent was knowingly and intelligently waived under the totality of the circumstances, id. at 1046, 103 S.Ct. at 2835. We believe the requirements expressed in Bradshaw have been met to satisfy the Edwards doctrine.
We do not believe that appellant's request for a "dip of snuff" was sufficient to indicate a desire to initiate further conversation concerning the charged offense. As stated inBradshaw, 462 U.S. at 1045, 103 S.Ct. at 2835:
 "There are some inquiries, such as a request for a drink of water or a request to use a telephone, that are so routine that they cannot be fairly said to represent a desire on the part of an accused to open up a more generalized discussion relating directly or indirectly to the investigation."
However, when appellant stated, "I want to get it off my chest. I did it. It was self defense," he clearly initiated further conversation with the authorities and indicated a desire to make a statement concerning the McNaughton killing. Appellant did not merely indicate a desire to talk with authorities in a general manner; he indicated a desire to specifically discuss his involvement in the incident. It is apparent to us that appellant's statement to Shaner "was not merely a necessary inquiry arising out of the incidents of the custodial relationship," 462 U.S. at 1046, 103 S.Ct. at 2835; his statement could only be understood as a desire to initiate further discussion with authorities concerning his role in the charged offense.
There is nothing in the record to suggest that Shaner made any threats, promises or inducements or otherwise tricked appellant in any manner in order to prompt the statement which initiated further interaction between appellant and the authorities. The parties stipulated that before anything further was done, appellant was properly informed of hisMiranda rights and a taped statement followed.
Having determined that appellant "initiated" further conversation with authorities within the meaning of Edwards, we must now determine whether there was sufficient evidence from which the trial court could properly conclude that appellant knowingly and intelligently waived his right to counsel under the totality of the circumstances. Bradshaw; Edwards; Sullivanv. State, 351 So.2d 659 (Ala.Crim.App.), cert. denied,351 So.2d 665 (Ala. 1977). Whether a statement is voluntarily made is a question of law and should be *Page 1367 
determined by the trial judge. See Chambers v. State,455 So.2d 1008 (Ala.Crim.App. 1984); Myers v. State, 401 So.2d 288
(Ala.Crim.App. 1981); Hale v. State, 420 So.2d 821
(Ala.Crim.App. 1982). "The State still has the heavy burden to prove that a person in custody `knowingly and intelligently' waived his privilege against self-incrimination and his right to retained or appointed counsel." Williamson v. State,370 So.2d 1054, 1062 (Ala.Crim.App. 1978), aff'd, 370 So.2d 1066
(Ala. 1979), vacated on other grounds, 448 U.S. 903,100 S.Ct. 3042, 65 L.Ed.2d 1132 (1980) (quoting Miranda); Williams v.State, 387 So.2d 295 (Ala.Crim.App. 1980). "In considering whether a confession or inculpatory statement is voluntarily made, the trial judge need only be convinced from a preponderance of the evidence as to the rules of voluntariness." Chambers, 455 So.2d at 1010; see also Hale; Lego v. Twomey, 404 U.S. 477,92 S.Ct. 619, 30 L.Ed.2d 618 (1972). "The test for the voluntary nature of an extra judicial confession or inculpatory statement is whether in the light of all the surrounding circumstances, the statement was free from inducement, threat or promise, either expressed or implied, which would have produced in the mind of the accused any fear of harm or hope of favor." Rogers v. State,365 So.2d 322 (Ala.Crim.App.), cert. denied, 365 So.2d 334 (Ala. 1978), and cases cited therein.
We have carefully reviewed the facts of this case and have considered the following factors: (1) Appellant was informed of his Miranda rights on three occasions and signed a form to this effect on one such occasion; (2) an officer "went over" this form and specifically informed him of his right to counsel prior to his signing; (3) appellant stated he understood the rights contained in the form; (4) appellant freely and voluntarily made a statement when he was first brought to the police station, and this statement is not contested on appeal; (5) appellant's desire not to talk with Sheriff Worthington, for whatever reason, indicated cognizance of his rights to remain silent and to have a lawyer present; (6) appellant's action in refusing to make a videotaped statement and his request for a lawyer further demonstrate his knowledge concerning his rights in question; (7) there is absolutely no evidence to suggest that the authorities offered any inducements, made any threats or promises, intimidated, coerced, or prompted appellant in any way to make the statements; and (8) there is no contention that appellant was denied food or rest, was subjected to protracted examination, or was under the influence of drugs or alcohol. Appellant's desire to waive his right to remain silent and forgo benefit of counsel is most clearly evidenced by his own words, "I want to get it off my chest. I did it. It was self defense." We further find that appellant was not tricked into confessing because Shaner offered a "dip of snuff"; there is nothing to suggest that anyone was aware that appellant "dipped snuff." We are of the opinion that the trial court's determination of voluntariness was correct and the statements made by appellant were properly admitted into evidence at trial.
 III
Appellant's final contention is that the trial court erred in overruling his motion to dismiss the indictment. Appellant argues that Count I of the indictment is insufficient because it fails to specify the value of the property taken "during the robbery portion of the indictment." The contested count reads as follows:
 "The Grand Jury of said County charges that before the finding of this Indictment and after July 1, 1981, Dewitt Searight, alias Dewitt Seawright, whose name is to the Grand Jury otherwise unknown, did intentionally cause the death of, to-wit: Clyde Douglas McNaughton, by shooting him with a .22 caliber rifle, and Dewitt Searight, alias Dewitt Seawright, caused said death during the time that Dewitt Searight, alias Dewitt Seawright, was in the course of committing a theft of, to-wit: a .357 magnum revolver, or, to-wit: one 1979 Pontiac Lemans 4-door automobile, light blue in color, or to-wit: *Page 1368 lawful currency of the United States of America, the amount and denominations being otherwise unknown to the Grand Jury, the property of Clyde Douglas McNaughton, by the use of force against the person of Clyde Douglas McNaughton with intent to overcome his physical resistence, while the said Dewitt Searight, alias Dewitt Seawright, was armed with a deadly weapon, to-wit: a .22 caliber rifle, in violation of Code of Alabama 1975, § 13A-5-40 (a)(2), against the peace and dignity of the State of Alabama." (Emphasis added.)
Appellant relies on Jordan v. State, 51 Ala. App. 198, 199,283 So.2d 648 (1973), for the proposition that "[r]obbery is the felonious taking of money or goods of value from the person of another or in his presence by violence to his person or putting him in fear." Jordan was decided prior to the adoption of the Alabama Criminal Code, which took effect January 1, 1980. Prior to adoption of the present robbery statutes, there was no statutory robbery provision in this state and the common law prevailed. See Williams v. State, 48 Ala. App. 737,267 So.2d 526 (1972). "The criminal code definition of robbery has thus altered the common law definition. When robbery was made a statutory offense, the test for the sufficiency of a robbery indictment was changed. The indictment is judged by the statutory language and elements instead of the former common law elements." Smith v. State, 446 So.2d 68, 72 (Ala.Crim.App. 1984).
In Grace v. State, 431 So.2d 1331, 1333 (Ala.Crim.App. 1982), this court stated:
 "Common law robbery required a `taking' of property from the person of another, Wilson v. State, 268 Ala. 86, 105 So.2d 66 (1958), although the amount or value of the property taken was immaterial, Sanders v. State, 289 Ala. 224, 266 So.2d 802 (1972); Harris v. State, 44 Ala. App. 449, 212 So.2d 695 (1968).
 "The present robbery statutes, however, do not require a `taking' of property, Marvin v. State, 407 So.2d 576 (Ala.Cr.App. 1981); Ala. Code §§ 13A-8-40
through 13A-8-44 (1975) (Commentary), so that not only is the value of the property immaterial, but also the indictment need not allege an actual theft to constitute the offense. The operative words of the current robbery statute are `in the course of committing a theft,' which includes an attempted theft, Marvin v. State, supra, rather than the common law element of an actual `taking from the person.'" (Emphasis added.)
It is clear that the robbery portion of the indictment was sufficient to charge the crime of robbery and a further averment as to the value of the property was unnecessary.
Based on the foregoing, this case is due to be, and is hereby, affirmed.
AFFIRMED.
All Judges concur.