548 So.2d 459 (1987)
Gregory ACRES
v.
STATE.
3 Div. 843.
Court of Criminal Appeals of Alabama.
February 10, 1987.
Rehearing Denied March 24, 1987.
On Return to Remand October 28, 1988.
Rehearing Denied December 30, 1989.
Certiorari Denied March 31, 1989.
On Return to Remand July 21, 1989.
*460 Charles M. Law, Montgomery, for appellant.
Charles A. Graddick, Atty. Gen., and William D. Little, Asst. Atty. Gen., for appellee.
Alabama Supreme Court 88-456.
PATTERSON, Judge.
The appellant, Gregory Acres, was indicted and convicted for the capital offense of murder of Elbert Lee Jackson, during a robbery in the first degree, or an attempt thereof, in violation of § 13A-5-40(a)(2), Code of Alabama 1975. After a sentencing hearing, the jury recommended, by a vote of seven to five, to sentence appellant to life imprisonment without possibility of parole. Thereafter, the trial court rejected the jury's advisory verdict and sentenced appellant to death.
The prosecution's main witness was Tommy Floyd, who had already been convicted for the capital murder of Jackson,[1] and who testified to the following events. On April 28, 1982, appellant went to Floyd's house. He, Floyd, and Sammy Lee Felder,[2] who was already at Floyd's house, stayed *461 at Floyd's house approximately forty-five minutes, where they were "drinking a little gin and beer and wine and stuff." Thereafter, they left Floyd's house and met Franklin Ellis, and the four walked to Riverside. During the walk, they consumed a six-pack of beer. When they arrived at Riverside, Ellis left the other three, who then purchased a bottle of wine. After they consumed it, Ellis rejoined them, and they started back to Floyd's house. While walking, they talked about how much they wished for some money and how they did not have any. After dark, they went to the bus station, where they saw a cab parked. It was numbered "7." Felder said, "Let's get this cab." Then, the four of them got into the cab and when the driver asked where they wanted to go, Felder replied, "Madison Park." Right after they left the bus station, Ellis said he had left something, so the driver returned to the station and Ellis got out of the cab. When Ellis did not return, appellant said, "He ain't coming. Let's go." When they got to Madison Park, Felder directed the driver, but the driver stopped after a few directions and asked, "Whereabouts?" Then, appellant, who was sitting in the back seat, grabbed the driver from behind; Floyd put the car's transmission into "park"; and Floyd and Felder got out of the cab and pulled the driver out of the cab. Appellant got out of the cab; searched the driver's pockets and the floorboard of the cab; and gave the money, which he had taken from the driver, to Floyd, who put it into his pocket. Up to this point, the driver had said nothing; but after Floyd and appellant hit him and Felder hit him and knocked him down, he said, "Don't ya'll hurt me, ya'll can have the money." Then, the trio kicked the driver, two or three times each; they jumped on his chest; appellant tied a rope around his neck, and Felder took the free end of the rope, and they both pulled it very tightly; Felder drove the cab and backed it over him; and, finally, they dragged him by the rope to a tree and tied the rope around the tree. At this point, the victim was still alive. During this heinous assault, after they jumped on the driver, appellant urged the others to kill the driver. He stated, "We might as well go ahead and kill him because we're going to go to jail anyway." When Felder objected and explained that there was no need to kill him, appellant persisted and argued that the driver would talk. After the assault, they left the scene in the cab, Felder driving. As they were leaving, Felder backed the cab over the victim again. They drove south on Interstate 65 until the car ran out of gas. After they stopped, Felder tried to pull the sign from the roof of the cab. In addition, the radio microphone had been pulled out at an unspecified time by Floyd at appellant's instruction.
Floyd's testimony was substantially corroborated by the testimony of Franklin Ellis. He testified that, on the afternoon of April 28, near High Street, he met Floyd, Felder, and appellant and went to Riverside with them; that on the way back, his three companions tried to break into several locked cars; and that, then, they went to the Trailways Bus Station. Ellis further explained that, after he exited the restroom at the station, he saw the other three in a cab numbered "7," so he got into the cab, too; that when he heard over the cab radio that the fare was $8.00, he told the driver that he had forgotten something and to turn around; that he said this because he did not have $8.00; and that, when the driver returned to the station, he exited the cab and left the area. Ellis also testified that, a couple of weeks after this incident, appellant told him the following: "I heard about you going around telling everybody we killed the cab driver. You better be cool cause something will happen to you." Finally, Ellis stated that appellant continued to harass him until appellant assaulted Ellis on October 9, and Ellis, while being treated at the emergency room, talked with several police officers about the robbery-murder.
The prosecution also presented testimony establishing the following events. The victim, who drove cab number "7," radioed the night dispatcher of the Yellow Cab Company at 10:19 p.m. on April 28. The dispatcher's entry in his log shows that the *462 victim's point of departure for this fare was the Trailways Bus Station and his destination was Madison Park, 231 North. The dispatcher talked with the victim again at 10:24 p.m.; but when he tried to contact him at 10:45 p.m., 11:15 p.m., and 11:45 p.m., he received no response. The log book also shows that the victim had eight fares that day, but he turned in no money.
The cab was found at approximately 2:00 a.m. on April 29, parked on the shoulder of the southbound lane of Interstate 65, south of Montgomery. Its gas gauge registered empty, and it would not start. Blood spots were found on the trunk lid and on the back seat; the radio microphone's cord had been cut, and the cord and microphone were missing; the lever of the meter was broken off; the advertising sign on top of the car was damaged; the gravel shield underneath the rear bumper was damaged; mud and dirt were apparent on the bumper and wheels; and Felder's prints were found on a box in the trunk, on the trunk lid, and on the rear door on the driver's side.
The victim's body was found at approximately 6:30 a.m. that same morning, approximately fifteen feet from a dead-end, dirt road. It was tied to a limb of a bush. An autopsy revealed that the body's injuries were consistent with the victim having been choked by a rope and hanged; having been kicked and beaten; having been dragged across dirt; and having had great force applied slowly to the torso area. The pathologist opined that this great force could have been the tire of an automobile if the automobile was moving slowly over the body. The cause of death was determined to be ligature strangulation.
At the scene where the body was recovered, the police evidence technician found a wrist watch which had a cracked crystal and had stopped at 10:32. A lever from a cab's meter was also discovered and later determined to have come from the victim's cab. A belt which was missing a buckle was also found; a buckle found on the back seat of the cab had the same class characteristics as the recovered belt. Finally, the victim's shirt had stains consisting of undercarriage grease from a vehicle and blood stains.
After the investigating officers took statements from Ellis and Felder on October 9, they arrested appellant pursuant to a warrant. After appellant was advised of his Miranda rights several times and had signed two waiver forms, he gave a statement, which was taped. In this statement, appellant explained that, on the afternoon of April 28, Felder said he wanted to rob someone, and he told Felder that that was not a good idea; that when he, Felder, and Floyd got into the cab, Felder directed the driver to the area in Madison Park where Felder and Floyd assaulted the driver; that he did not touch the driver or rob him, but simply sat in the cab and watched; that Floyd told Felder that the driver had to be killed, so Felder ran over him and tied him to a tree, and Floyd tore out the radio microphone and broke the meter lever; and that, after the three left the scene, the cab stalled at the Bell Street Exit of Interstate 65 and, there, he got out of the cab and went home. Appellant also stated that he did not know that Floyd and Felder were going to do anything. Finally, he stated that he did not get any of the money taken from the victim; but that the following day, Floyd and Felder bought some wine, and he drank it with them.
Although the defense counsel called several witnesses, no defense of any substance was presented.

I
Appellant contends that the trial court erred in denying his motion to dismiss the indictment and overruling his demurrer to the indictment. He specifically argues that the indictment fails to charge an offense because Counts V through VIII do not specify the value of the "currency or coinage" taken in the robbery and that it is vague and indefinite because, if the value of the "currency or coinage" is unknown, it could be of no value, which would render the counts invalid for not charging a crime. Counts V through VIII charged appellant with the murder of Elbert Lee Jackson during the time that appellant was committing *463 robbery. The counts specifically alleged that the murder occurred during the time that appellant
"was in the course of committing a theft of lawful currency or coinage, or currency and coinage of the United States of America, a better description of which is unknown to the Grand Jury, in an amount or value otherwise unknown to the Grand Jury, the property of Elbert Lee Jackson...."
Appellant's counsel submitted this precise issue for our review in Seawright v. State, 479 So.2d 1362, 1367-68 (Ala.Cr.App.), cert. denied, No. 85-38 (Ala.1985). In reviewing the capital indictment, which specified that the murder occurred during the theft of "lawful currency of the United States of America, the amount and denominations being otherwise unknown to the Grand Jury," id. at 1368, we stated the following:
"Appellant relies on Jordan v. State, 51 Ala.App. 198, 199, 283 So.2d 648 (1973), for the proposition that `[r]obbery is the felonious taking of money or goods of value from the person of another or in his presence by violence to his person or putting him in fear.' Jordan was decided prior to the adoption of the Alabama Criminal Code, which took effect January 1, 1980. Prior to adoption of the present robbery statutes, there was no statutory robbery provision in this state and the common law prevailed. See Williams v. State, 48 Ala.App. 737, 267 So.2d 526 (1972). `The criminal code definition of robbery has thus altered the common law definition. When robbery was made a statutory offense, the test for the sufficiency of a robbery indictment was changed. The indictment is judged by the statutory language and elements instead of the former common law elements.' Smith v. State, 446 So.2d 68, 72 (Ala.Crim.App.1984).
"In Grace v. State, 431 So.2d 1331, 1333 (Ala.Crim.App.1982), this court stated:
"`Common law robbery required a "taking" of property from the person of another, Wilson v. State, 268 Ala. 86, 105 So.2d 66 (1958), although the amount or value of the property taken was immaterial, Sanders v. State, 289 Ala. 224, 266 So.2d 802 (1972); Harris v. State, 44 Ala.App. 449, 212 So.2d 695 (1968).
"`The present robbery statutes, however, do not require a "taking" of property, Marvin v. State, 407 So.2d 576 (Ala.Cr.App.1981); Ala.Code §§ 13A-8-40 through 13A-8-44 (1975) (Commentary), so that not only is the value of the property immaterial, but also the indictment need not allege an actual theft to constitute the offense. The operative words of the current robbery statute are "in the course of committing a theft," which includes an attempted theft, Marvin v. State, supra, rather than the common law element of an actual "taking from the person."' (Emphasis added.)
"It is clear that the robbery portion of the indictment was sufficient to charge the crime of robbery and a further averment as to the value of the property was unnecessary."
Seawright, 479 So.2d at 1368. See also Maxwell v. State, 488 So.2d 517, 518 (Ala.Cr.App.1986) ("In a prosecution for robbery, an allegation of the value of the property taken is unnecessary and need not have been proved").
However, we do not rely on the reasoning of Seawright to find the instant issue to be without merit, for in this court's later opinions in Brown v. State, 481 So.2d 1173 (Ala.Cr.App.1985), and Anderson v. State, 480 So.2d 64 (Ala.Cr.App.1985), both concerned with convictions under the Alabama Criminal Code, a conflict with our Seawright opinion arises. In Brown, 481 So.2d at 1176, in quoting Anderson, 480 So.2d at 65, we stated the following: "While the indictment in this case did not allege a specific amount of money, this defect makes the indictment voidable not void. Edwards v. State, 379 So.2d 336 (Ala.Crim.App.1979), cert. denied, 379 So.2d 339 (Ala.1980)." The court in Edwards, 379 So.2d at 338, stated, in pertinent part, as follows:

*464 "An indictment for robbery must aver the denomination of the money taken or that the particular denomination is unknown to the grand jury. [Citations omitted.]
"Thus, while the present indictment is defective and insufficient because it does not aver the denomination of the money taken, this particular defect does not vitiate the indictment, Reed v. State, 88 Ala. 36, 6 So. 840 (1889), because the denomination or the kind of money taken is not a material ingredient of the offense of robbery. Wesley v. State, 61 Ala. 282 (1878). An indictment which does not specify the number and denomination of the money involved is merely voidable and not void; it is not so deficient as to deny the accused due process of law. Williams v. State, 49 Ala.App. 74, 76, 268 So.2d 855 (1972)."
This case was decided prior to the effective date of the present criminal code.
While we recognize the apparent conflict in our recent decisions, we decline this opportunity to resolve it, for we need not do so to uphold the sufficiency of the instant indictment.
It is beyond question that the amount of currency or coinage is an immaterial ingredient of the offense of robbery. See, e.g., Brewer v. State, 497 So.2d 567 (Ala.Cr.App.1986); Maxwell v. State, 488 So.2d 517 (Ala.Cr.App.1986); Anderson v. State, 443 So.2d 1364 (Ala.Cr.App.1983); Grace v. State, 431 So.2d 1331, 1333 (Ala.Cr.App.1982); Frazier v. State, 56 Ala.App. 166, 320 So.2d 99 (1975). As stated in Maxwell, 488 So.2d at 518-19:
"`[T]he amount of money or the value of property taken is immaterial in a robbery prosecution. It is consistently held in Alabama that the crime of robbery is basically a crime against the person.' Anderson v. State, 443 So.2d 1364, 1371 (Ala.Cr.App.1983). `Alabama law did not generally concern itself with how much money or property was taken.' Alabama Code 1975, §§ 13A-8-40 through 13A-8-44 Commentary.
". . . .
"The Alabama Criminal Code, effective January 1, 1980, enlarged and broadened the definition of robbery to include what had traditionally been regarded as assault with intent to rob and attempted robbery. Ex parte Wesley, 481 So.2d 1162 (Ala.1985); Petty v. State, 414 So.2d 182, 183 (Ala.Cr.App.1982). Under the present statutory definition of robbery, it is not essential that any property be taken from the victim. Consequently, the value and amount of any property taken is immaterial. §§ 13A-8-40 through 13A-8-44 Commentary."
Any fact which is not a material ingredient of the offense and which is unknown to the grand jury may be so charged in the indictment. Ala.Code (1975), § 15-8-26. Such was done in the instant indictment, for the indictment alleged the "theft of lawful currency or coinage, or currency and coinage of the United States of America ..., in an amount or value otherwise unknown to the Grand Jury...." Thus, the indictment was sufficient. Cf. Fowler v. State, 448 So.2d 477 (Ala.Cr.App.1984) (wherein the court upheld an indictment which failed to specify the denomination of currency, but indicated that the denomination of currency taken was unknown to the grand jury); Webber v. State, 376 So.2d 1118, 1126 (Ala.Cr.App.), cert. denied, 376 So.2d 1129 (Ala.1979) ("There have been numerous decisions affirming the holding that an averment that the particular denominations of money are unknown to the grand jury is sufficient description").

II
Appellant also contends that the trial court erred in denying his motion to suppress on the ground that he had been illegally arrested and, thus, that any "fruit from the poisonous tree" should have been suppressed.
During a pre-trial hearing conducted on this motion, the court heard the following testimony from Sergeant Ward of the Montgomery Police Department. On October 9, after the robbery-murder occurred on April 28, 1982, Sergeants Ward and *465 Hicks received an anonymous call from a black female who stated that her brother had been severely beaten, that he was at the emergency room, and that he had information about the taxi driver who had been killed several months prior. Sergeant Ward went to the Baptist Hospital emergency room, where he talked with Franklin Ellis. Ellis told him that he, appellant, Floyd, and Felder were in Riverside; left there and, while going down Bell Street, tried to break in numerous cars and talked about robbing a service station, but changed their minds; and went to the bus station where they got in a taxi numbered "7." Ellis further explained that he got out of the taxi because he knew that none of them had any money and "he knew something bad was going to happen." Ellis also stated that, on several occasions two or three weeks after this, he was approached by appellant, who told him he "better not say anything about it or he'd take care of him." Ellis explained that he was at the hospital because he had been beaten by appellant and Larry Cheatam, who told him that they had heard he had been "running his mouth" about the murder and that they would kill him if he said anything else.
During the early morning of October 10, Sergeant Ward talked to Felder, who was in the city jail on a charge of rape. Felder, after being advised of his Miranda rights, stated that he, appellant, Floyd, and Ellis, after having left Riverside, went to the bus station, where the four got into a taxi. He further stated that, just after getting in the taxi, Ellis told them that he was going to get something he had left in the station, and he left; that Floyd told the driver to leave and take them to Madison Park; and that, when they arrived at their destination, they robbed and killed the driver.
After he heard these two conversations, Sergeant Ward, assisted by several others, typed arrest warrants for appellant and Floyd, along with a warrant for Felder, who was already in custody. Appellant was arrested under the warrant that had been signed.
On cross-examination, Sergeant Ward explained that he did not verify Ellis's and Felder's information by independent sources because their information was so detailed that it was apparent that they were somehow involved. He further explained that he considered Felder's information to be reliable because Felder was aware of a lot of information about the case which had not been released to the public and which he could have known only by being present at the scene. Sergeant Wade also stated that some details given by Felder and Ellis were identical to those already known.
An officer is authorized to make a warrantless arrest[3] when a felony has been committed and he has reasonable cause to believe that the person arrested committed it. Ala.Code (1975), § 15-10-3(3). The requirement of reasonable cause has been equated with probable cause. Ex parte Meeks, 434 So.2d 844, 846 (Ala.1983). When probable cause is based wholly or partly on an informant's statements, the "totality of the circumstances" approach of Illinois v. Gates, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983), is utilized to determine the existence of probable cause. Thus, "an informant's `veracity,' `reliability,' and `basis of knowledge' are all highly relevant...." Id. at 230, 103 S.Ct. at 2328. Appellant specifically insists that the officers' information upon which they claimed to have based their finding of probable cause consisted of nothing but the statements of Ellis and Felder, which, he says, were unreliable and untrustworthy. We find no merit to appellant's argument.
In so holding, we adhere to the principles enunciated in Carter v. State, 435 So.2d 137, 138-39 (Ala.Cr.App.1982). In Carter, 435 So.2d at 138, the court addressed the following allegation: "[T]here was no probable cause for [the appellant's] arrest because information gained from an *466 accomplice is not worthy of belief, and consequently the veracity prong of Aguilar v. Texas, 378 U.S. 108 [84 S.Ct. 1509, 12 L.Ed.2d 723] ... (1964), was not satisfied." Although the Aguilar-Spinelli two-pronged test has been abandoned, Massachusetts v. Upton, 466 U.S. 727, 732, 104 S.Ct. 2085, 2087, 80 L.Ed.2d 721 (1984), we find the following discussion most pertinent since, as we have already noted, veracity and reliability are still highly relevant considerations in the "totality of the circumstances" analysis.
"Courts have been `most willing' to find the veracity prong of Aguilar satisfied where the informer is a participant in a serious crime who identifies his accomplice. W. LaFave, 1 Search and Seizure, Section 3.3 at 527 (1978). However, there seems to be a general agreement that, in the case of the accomplice-informant, an admission against penal interest, without more, is not enough to justify a finding of probable cause and is insufficient, in and of itself, to establish the reliability of the informant. United States v. Harris, 403 U.S. 573 [91 S.Ct. 2075, 29 L.Ed.2d 723] ... (1971); United States v. Martin, 615 F.2d 318, 325 (5th Cir.1980); United States v. Ashley, 569 F.2d 975, 981-2 (5th Cir.1978). `Concededly admissions of crime do not always lend credibility to contemporaneous or later accusations of another.' Harris, [403 U.S. at 584, 91 S.Ct. at 2082].
"The existence of probable cause must be determined from the particular facts of each case. Consequently, courts have found that the veracity prong of Aguilar was satisfied and the informant credible where the accomplice-informant's information was not vague but contained a particular description of the `utmost precision,' Bernard v. United States, 360 F.2d 300 (5th Cir.1966); where the accomplice-informer related the `underlying circumstances' of the offense which were corroborated by information obtained from eyewitnesses, United States v. Mendoza, 441 F.2d 1107 (9th Cir.1971); where the participant's tip was against his penal interest and was substantially corroborated by other informants, Martin, supra; and where the participant's information was independently corroborated and verified, Ashley, supra; United States v. Sporleder, 635 F.2d 809 (10th Cir.1980); United States v. Hampton, 633 F.2d 927 (10th Cir.1980), cert. denied, 449 U.S. 1128 [101 S.Ct. 950, 67 L.Ed.2d 116] ... (1981); see 70 Georgetown L.J. 467, 479, n. 61 (1981).
".... It has been suggested that, where the `credibility' of the informer is not established in that there is no `track record' of past performance or its equivalent, the veracity prong may still be satisfied, without any resort to independent verification by other circumstances reasonably guaranteeing the reliability of the information on the particular occasion of its being furnished.
"`A genuine declaration against penal interest would probably qualify in this regard, even when we know nothing about the source as a person, or even where he is characteristically non-credible. A source's furnishing of information, under clearly apprehended threat of dire police retaliation should he not produce accurately, might also well qualify as such a circumstantial guarantee.' Moylan, Hearsay And Probable Cause: An Aguilar and Spinelli Primer, 25 Mercer L.Rev. 741, 762 (1974)."
Carter v. State, 435 So.2d at 138-39.
In the instant case, we find Felder's confession to be sufficiently reliable to furnish the officers with probable cause to arrest appellant. Foremost, Felder's information was unquestionably an admission against penal interest. Furthermore, it was substantially corroborated by Ellis's account and was verified by independent evidence gained by the intervening six-month investigation. Finally, as acknowledged by Sergeant Wade, the confession was so detailed that it was clear that Felder was involved. Accordingly, any "fruits" of appellant's arrest were admissible, for they are not "fruits" of an illegal detention.

III
After closing arguments were heard, the following occurred:

*467 "Mr. Law [Defense counsel]: I'd like to get this in the record, make an offering. I'd like to offer that the District Attorney, at the end of the closing, went over to the
"Mr. Evans [District Attorney]: Didn't do nothing. I went over and spoke to her and asked her if it's all right.
"Mr. Law: At the end of his closing before the jury was dismissed, he went over to the
"Mr. Evans: Judge, I didn't want a crying demonstration in the court. I thought I saw the lady about to cry.
"Mr. Law: She's been crying all through the trial, been placed on the front of the court benches out there and he goes over after that. It's just so prejudicial, Judge, I would askI don't think you can instruct the juryI would ask for a mistrial.
"The Court: Denied."
Appellant contends that the trial court erred in denying this motion for mistrial. In arguing this issue, appellant alleges that, after the prosecution's argument in rebuttal, the district attorney "proceeded over to the victim's wife and put his arm around her to console her and stop her from crying"[4] and that "this was done solely for the purpose of arousing sympathy for the victim and victim's wife and family to the prejudice of the defendant."
In addressing this issue, we find the alleged occurrence to fall within the context of the following observations:
"There can be no doubt that the object or purpose of all trials is to see that the parties litigant receive a fair and impartial trial before a jury without any outside influence not justified by law. Any `stage setting' that would thwart this concept of a fair trial is to be condemned and trial judges should always be alert to prevent it. In accomplishing this purpose, the duty rests upon the trial judge, and to him must, of necessity, be committed matters of discretion which may not be reviewed unless it be made clearly to appear that his discretion has been abused. He should permit no display of any kind which has for its only purpose and result a tendency to prejudice, unlawfully, the minds of the jury. In matters of this kind arising in trials involving great human interest, trial judges should be careful to see that no extrinsic influences are projected into the proceedings in such a way and manner as to bring them into a consideration by the jury when it comes to make up its verdict."
Howard v. State, 273 Ala. 544, 546-47, 142 So.2d 685, 687 (1961).
In the instant case, we unhesitatingly defer to the trial court's decision, especially since the record does not convey the incident in its totality.
"The granting or denying of a motion for mistrial is within the sound discretion of the trial judge because he is in a much better position to determine what effect, if any, some occurrence may have had upon the jury's ability to decide the defendant's fate fairly and justly. This is particularly true where a disturbance at the trial is not completely incorporated into the record as in the present case. We will not interfere with the trial judge unless there has been a clear abuse of his discretion...."
Perry v. State, 368 So.2d 305, 308 (Ala.Cr.App.1978), rev'd on other grounds, 368 So.2d 310 (Ala.1979) (as quoted in Minnifield v. State, 392 So.2d 1288, 1290 (Ala.Cr.App.1981), wherein the court held that the trial court did not err in denying the appellant's motion for mistrial based on the audible sobbing of the rape victim after her testimony). "[The trial judge] heard what transpired and has seen the scenario unfold. He is in a far better position to determine whether a jury should be discharged and a mistrial granted." Duncan v. City of Birmingham, 384 So.2d 1232, 1240 (Ala.Cr.App.1980). "No one has a better vantage point from which to observe the parties, the issues and the general circumstances *468 than the trial court and great weight should be accorded its determination." Harrison v. State, 340 So.2d 849, 852 (Ala.Cr.App.), cert. denied, 340 So.2d 854 (Ala.1976).
"Generally, it is not an abuse of the trial judge's discretion to deny a new trial in cases where the members of the victim's family have sat within the bar of the court or within the view of the jury and wept quietly, sobbed aloud, or even fainted." Howard v. State, 273 Ala. at 546, 142 So.2d at 687 (citations omitted). Yet, we have before us a more dubious situation. We do not condone the district attorney's behavior in the instant case. Cf. Smith v. State, 36 Ala.App. 646, 650, 62 So.2d 473, 476 (1953) (wherein the court expressed disapproval of "undue familiarity of counsel with the jurors while engaged in argument," but did not declare prejudicial error). However, we find that the record, buttressed by the trial court's action in denying appellant's motion, does not show that appellant was ineradicably prejudiced or harmed in any way. Id. Our condemnation "relates more to the dignity and decorous procedure of a trial" than it does to the matter of attempting to gain the jury's favor or sympathy. Id.
A high degree of "manifest necessity" for the granting of a mistrial must be demonstrated before a mistrial should be granted. Woods v. State, 367 So.2d 982 (Ala.1978); Ala.Code (1975), § 12-16-233. "The entry of a mistrial is not lightly to be undertaken.... [T]he entry should be only a last resort, as in cases of otherwise ineradicable prejudice." Thomas v. Ware, 44 Ala.App. 157, 161, 204 So.2d 501, 504 (1967) (emphasis in original). Since we find any prejudice to have been eradicable, the motion was correctly denied. The trial court saw and heard all that occurred during this incident and, from the record before us, we find no reversible error in the action of the trial court.

IV
Appellant finally insists that the trial court committed reversible error by refusing his written requested jury charge number nine, which reads, as follows:
"I charge you, members of the jury, that in this case as in all criminal cases, the defendant is presumed innocent until proven guilty and that if by any reasonable construction of the evidence in this case some one other than the defendant could have or might have done the things [with] which the defendant is charged, then it is your duty to give the defendant the benefit of the doubt and find him not guilty."
We find, as argued by the attorney general, that the trial court did not err in refusing this requested charge, for it was substantially and fairly covered elsewhere in the court's charge. See Lambeth v. State, 380 So.2d 923 (Ala.1979).

V
As mandated by A.R.A.P. 45A, this court is to "notice any plain error or defect in the proceedings under review ... and take appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial right of the appellant." Pursuant to our duty, we find in the following facts a "defect in the proceedings" which "has or probably has adversely affected the substantial right of the appellant."
After jury selection, appellant, who is black, entered a motion for mistrial "based upon the District Attorney's systematic exclusion of blacks during his striking." Thereafter, the prosecutor and defense counsel stipulated that, with his twelve strikes, the prosecutor struck eleven black persons and a white person, a minister employed by the penitentiary system. Two black persons remained on the jury. Pursuant to defense counsel's request for the prosecutor to testify about why he struck each venireperson, the prosecutor testified, as follows: "I strike the jury on my individual personal belief as to inclination to convict or acquit.... I exercised my strikes in the best interest of the State and [they were] not exercised along racial lines." This, in essence, is the gist of his testimony. The trial court sustained each objection entered by the prosecution and directed *469 to defense counsel's inquiries into the prosecutor's particular reasons for each strike of a black person. Appellant produced no other pertinent evidence. The trial court denied appellant's motion.
We are compelled, upon these facts, to remand this cause pursuant to the holding of Batson v. Kentucky, 476 U.S. 79, 100, 106 S.Ct. 1712, 1725, 90 L.Ed.2d 69 (1986) (White, J., concurring), that the "use of peremptory challenges in a given case may, but does not necessarily, raise an inference, which the prosecutor carries the burden of refuting, that his strikes were based on the belief that no black citizen could be a satisfactory juror or fairly try a black defendant." Pursuant to the Supreme Court's finding that the Batson ruling is to be retroactively applied to litigation pending on direct state review when Batson was decided, Griffith v. Kentucky, 479 U.S. 314, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987), and our supreme court's similar ruling, Ex parte Jackson, 516 So.2d 768 (Ala.1986), we find that the principles of Batson must be applied to the instant cause.
Although the prosecutor, in fact, revealed reasons for exercising his strikes as he did, we are inclined to remand this cause because the stated explanation does not satisfy that required by Batson.
"[T]he prosecutor may not rebut the defendant's prima facie case of discrimination by stating merely that he challenged jurors of the defendant's race on the assumptionor his intuitive judgmentthat they would be partial to the defendant because of their shared race. Cf. Norris v. Alabama, 294 U.S. [587], at 598-599, 55 S.Ct. [579], at 583-84 [79 L.Ed. 1074] [(1935)]; see Thompson v. United States, 469 U.S. 1024, 1025, 105 S.Ct. 443, 444 [83 L.Ed.2d 369] ... [1984] (BRENNAN, J., dissenting from denial of certiorari).... Nor may the prosecutor rebut the defendant's case merely by denying that he had a discriminatory motive or `affirming his good faith in individual selections.' Alexander v. Louisiana, 405 U.S. [625], at 632, 92 S.Ct. [1221], at 1226 [31 L.Ed.2d 536] [(1972) ].... The prosecutor therefore must articulate a neutral explanation related to the particular case to be tried."
476 U.S. at 97-98, 106 S.Ct. at 1723 (footnote omitted). "[T]he prosecutor must give a `clear and reasonably specific' explanation of his `legitimate reasons' for exercising the challenges." 476 U.S. at 98 n. 20, 106 S.Ct. at 1724 n. 20 (quoting Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 258, 101 S.Ct. 1089, 1096, 67 L.Ed.2d 207 (1981)).
Accordingly, we remand this cause to the trial court with the instructions that if the court determines that the facts establish the three circumstances[5] necessary for a showing of a prima facie case of purposeful discrimination under Batson,[6] the court must give the prosecutor the opportunity to come forward with race-neutral explanations for his use of the peremptory strikes. If the prosecutor is unable to do so, then appellant is entitled to a new trial. See Ex parte Owens, 531 So.2d 21 (Ala.1987); Ex parte Zackery, 521 So.2d 1 (Ala.1987); Ex parte Jackson. In the event that the trial court rules that appellant is not entitled to a new trial, the *470 court shall make written findings on this issue and forward those, along with a transcript of the hearing to this court.
REMANDED WITH INSTRUCTIONS.
All Judges concur.

ON APPLICATION FOR REHEARING
PATTERSON, Judge.
Upon our consideration of the attorney general's argument on rehearing and his cited authority, we are not persuaded to alter our holding and directives in regard to application of and compliance with Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).
OPINION EXTENDED; APPLICATION OVERRULED.
All Judges concur.

ON RETURN TO REMAND
PATTERSON, Judge.
On February 10, 1987, we remanded this case to the Circuit Court of Montgomery County, and directed it to conduct an evidentiary hearing to determine whether the facts establish a prima facie showing of purposeful discrimination under Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), and, if so, to allow the prosecutor an opportunity to provide race-neutral explanations, if any, for his peremptory strikes in selecting the jury which convicted appellant.
On remand, the trial court complied with the order of this court, and has filed a return. The return shows that the evidentiary hearing was held on July 30, 1987, and that the trial court issued a written order and opinion on July 5, 1988. The return was filed with this court on August 24, 1988.[1] The order, in pertinent part, provides, "Based on the findings set out in the Court's Memorandum Opinion, it is hereby ORDERED, ADJUDGED, and DECREED that the Motion for Mistrial filed in the above styled case, be and is hereby DENIED." The "Memorandum Opinion" referred to in the order, is set out, in pertinent part, as follows:
"This case was tried in 1983, some three years prior to the decision of Batson v. Kentucky, 476 U.S. 79 [106 S.Ct. 1712, 90 L.Ed.2d 69] ... (1986). Thus, no Batson hearing was conducted at the time of trial.
"Nevertheless, the Defendant challenged the jury make-up. After jury selection, the Defendant moved for a mistrial `based upon the District Attorney's systematic exclusion of blacks during his striking.' This motion was not made until after the jury was empaneled and sworn without objection. (R. 56) Thus, the objection was not timely. Kemp v. State, 516 So.2d 848 (Ala.Cr.App.1987); United States v. Erwin, 793 F.2d 656 (5th Cir.), cert. denied, 479 U.S. 991, 107 S.Ct. 589, 93 L.Ed.2d 590 (1986); Williams v. State, [530] So.2d [881] (Ala.Cr.App.1988) (3 Div. 310, Feb. 18, 1988). Therefore, Batson does not apply in this case.
"In an abundance of caution, and before memories grew even dimmer, this Court nevertheless held a hearing to preserve the record as to this issue and makes further findings.
"If Batson were held to apply, the record shows that the Defendant has adduced facts to establish the three circumstances necessary to invoke Batson. Therefore, the prosecutor was given an *471 opportunity to explain his peremptory strikes.
"The Defendant was tried more than four years prior to the hearing. At the hearing District Attorney James H. Evans, chief prosecutor in the case, had some, but not all, of the information about prospective jurors that was available to him at trial. District Attorney Evans did not have the notes he and his assistants made during voir dire which contained information about individual prospective jurors when each identified himself during voir dire. District Attorney Evans' notes are unavailable because of the passage of time since trial and not for any other reason. District Attorney Evans candidly admitted that, given the passage of time and the number of cases he has tried since petitioner's trial, he could not state with certainty his reasons for striking a given juror but could only state that, as to some jurors, information available to him then would have caused him to think they should be struck.
"Despite the fact that District Attorney Evans did not have all of the information that was available to him at trial when he testified at the evidentiary hearing, he was able to point to racially neutral factors that would have provided a basis for his peremptory strikes of prospective black jurors. The reasons are enumerated in the transcript of this hearing and are incorporated herein as if set forth here.
"The fact that District Attorney Evans, even without the most helpful information about the prospective jurors, could provide racially neutral reasons for his strikes is not the only evidence that he did not discriminate against prospective black jurors in exercising his peremptory strikes. His office had checked a number of sources to obtain information about all prospective jurors, white and black. The jury list for the week was compared with Department of Public Safety records (State's Exhibit No. 2); District Court records (State's Exhibit No. 4); and District Attorney's records of prior service (State's Exhibit No. 6). In addition, the complete list of jurors was circulated to all employees of the District Attorney's Office for review and comment. The entire list was compared with the Circuit Clerk's list, Montgomery County Sheriff's Office records, the Criminal Justice Information System records, Child Support records, and Municipal Court records. If District Attorney Evans had struck prospective black jurors because of their race, then he would not have needed the information about the backgrounds of all prospective jurors which he went to great lengths to obtain. District Attorney Evans considered all this information, as well as the jurors' responses, both verbal and non-verbal. Further, his strategy was altered when the Defendant struck two jurors he planned to strike. The Court has presided over numerous trials conducted by the District Attorney and his assistants and has not observed the State of Alabama exercising its peremptory strikes to systematically exclude prospective black jurors. The Court has presided over numerous criminal trials where black jurors have served.
"This Court does not take this matter lightly. Rather it has made every effort to fully evaluate the evidence and the law to reach a decision. The prosecutor's explanations were not merely accepted as stated. Nevertheless, his explanations were sufficient to overcome the presumption of bias. Therefore this Court finds the prosecutor's explanations for striking to be race-neutral and to meet the requirements of Batson and Ex parte Branch."
As pointed out in the trial court's memorandum, this case was tried prior to the United States Supreme Court's decision in Batson v. Kentucky; however, the transcript shows that appellant objected and moved for a mistrial on the ground that the district attorney had exercised his peremptory strikes in such a manner as to systematically exclude blacks from the jury because of their race. Appellant's motion for a mistrial came immediately after the jury had been selected and sworn. A hearing of sorts was held, and the district attorney *472 testified. He conceded that 11 of his 12 peremptory strikes were of blacks. He took the position that he did not have to explain his strikes, and that position was sustained by the trial court. He did testify that he struck prospective jurors on the basis of his personal belief as to their inclination to convict or acquit. The trial court denied the motion for a mistrial.
The trial court now takes the position that Batson does not apply in this case because there was no timely objection and because Batson had not been decided when this case was tried. It is true that we have held that a Batson issue must be raised prior to the jury's being sworn. Williams v. State, 548 So.2d 501 (Ala.Cr.App.1988). See also Bell v. State, 535 So.2d 210 (Ala.1988). However, as we pointed out in our original opinion, since this is a death penalty case, we are required by A.R.A.P. 45A to notice any plain error or defect in the proceedings, regardless of objection, and to take appropriate action when we find that the error has affected a substantial right of the appellant. If the state systematically excluded blacks because of their race, a substantial constitutional right of appellant was denied; thus, it is our duty to determine if such a systematic exclusion occurred and, if so, to take appropriate action. As we noted in our original opinion, we had grave doubts as to the manner in which the state exercised its peremptory strikes, and, for that reason, we remanded the case for a Batson hearing. The trial court's position that Batson does not apply, since it was decided after the trial of this case, has been answered by Griffith v. Kentucky, 479 U.S. 314, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987), and Ex parte Jackson, 516 So.2d 768 (Ala.1986), which hold that Batson is to be retroactively applied to litigation pending on direct state review when Batson was decided. The instant case was pending on direct review when Batson was decided, and the legal principles of Batson and Jackson must be applied in this case.
We note that the trial court determined that the facts adduced at the Batson hearing established a prima facie case of purposeful discrimination. The trial court found: "[T]he record shows that the Defendant has adduced facts to establish the three circumstances necessary to invoke Batson." We note the following: the case involves a black defendant and a white victim; the state exercised its 12 strikes by striking 11 blacks and 1 white; and the white was a minister who worked as a chaplain in the state prison system.
Thus, the trial court afforded the prosecution the opportunity to come forward and present race-neutral reasons for its strikes, if it had any. In an effort to do this, the district attorney testified at length, and the state offered into evidence certain documents reflecting general information about the members of the venire, i.e., name, address, race, date of birth, and occupation. The documents also contained a strike list showing the strikes and the party who exercised each strike, a list of the persons who served on the jury, the traffic offense records of various venirepersons, and criminal records pertaining to the members of the venire. The district attorney testified that the records that he had made at the time of the selection of the jury giving his reasons for striking prospective jurors were no longer in existence. He stated, "What I'm saying is that whatever notes that I would have taken at trial were not available because they have been lost, misplaced or otherwise something happened to `em.'" He admitted that he had no recollection of the reason for striking any venireperson from the panel. He testified that, if the documents contained information about a venireperson such as a driving infraction or an arrest or criminal record, there was a likelihood or a probability that he struck the potential juror for that reason, although he could not positively say that that was the reason. In essence, he gave no reason for striking any of the black venirepersons. The trial court recognized this in its findings: "District Attorney Evans candidly admitted that, given the passage of time and number of cases he has tried since petitioner's trial, he could not state with certainty his reasons for striking a given juror, but could only *473 state that, as to some jurors, information available to him then would have caused him to think they should be struck."
While the district attorney advanced some valid probable reasons based upon his research for striking some of the blacks on the venire, the validity of most of his black strikes do not stand up under close scrutiny. The district attorney stated that he probably struck venireperson No. 28 (Darrell Smith, black male, age 20), venireperson No. 38 (Mary J. Tyson, black female, age 19 and unemployed), and venireperson No. 51 (Maell Tucker, black female, age 19 and a student at a technical school) because they were young, about the same age as appellant (appellant was in his early 20's), unemployed, and would therefore probably be sympathetic with appellant. On the other hand, he struck venireperson No. 17 (Ivy B. Sloan, black female, age 47 and a school teacher), and venireperson No. 31 (Patsy C. Sawyer, black female, age 37 and employed at a high school), and could give no probable reason. He stated that he probably struck venireperson No. 22 (Sylvia B. Smiley, black female, age 34 and a secretary at a university) for having received a speeding ticket and venireperson No. 49 (Charles F. Harris, black male, age 25 and employed as an accounting clerk) for having been cited for speeding, for driving with no driver's license, and for making an improper turn. On the other hand, he did not strike venireperson No. 39 (Bobbie P. Sawyer, white female, age 56) although his records showed that she had been cited for speeding, and venireperson No. 42 (Alice K. Couch, white female), who had been cited for improper driving and for driving under the influence, which was reduced to reckless driving. Both Mrs. Sawyer and Ms. Couch served on the jury. He stated that he probably struck No. 23 (Cora A. Boyd, black female) because his records showed that she had been convicted of a crime. However, an examination of his records reveals that the subject of the conviction was a Felecia Cora Boyd, whose address and date of birth differed from those of venireperson Cora A. Boyd. Felecia Cora Boyd was obviously not the same person as Cora A. Boyd. This could have been clarified by a question on voir dire; however, no questions were asked of any venireperson, other than general qualification questions and questions concerning their belief in capital punishment. The voir dire examination sheds little light on the issue before us. Here, the absence of voir dire questions directed to the challenged jurors must be weighed against the prosecution. Ex parte Branch, 526 So.2d 609 (Ala.1987).
In the case now before us, a prima facie case of racially discriminatory strikes was established and, thus, a presumption arose that the strikes were used to discriminate. The trial court found such a presumption, and we agree. The state then had the burden of overcoming the presumption by showing that its strikes were race-neutral. The district attorney's general assertions that he did not strike jurors on a basis of race, but on his belief that they would acquit and not convict, will not overcome the presumption. The district attorney has given no specific reasons for challenging any juror. His explanations deal only with probabilities. Thus, we can only speculate as to his reasons, as he did. Moreover, a number of his reasons are suspect.
"After a prima facie case is established, there is a presumption that the peremptory challenges were used to discriminate against black jurors. Batson, 476 U.S. at 97, 106 S.Ct. at 1723. The state then has the burden of articulating a clear, specific, and legitimate reason for the challenge which relates to the particular case to be tried, and which is nondiscriminatory. Batson, 476 U.S. at 97, 106 S.Ct. at 1723.
". . .
"Batson makes it clear, however, that `[t]he State cannot meet this burden on mere general assertions that its officials did not discriminate or that they properly performed their official duties. Rather, the State must demonstrate that "permissible racially neutral selection criteria and procedures have produced the monochromatic result."' Batson, 476 U.S. at 94, 106 S.Ct. at 1721, citing Alexander v. Louisiana, 405 U.S. 625, 632 [92 S.Ct. *474 1221, 1226, 31 L.Ed.2d 536] (1972). Furthermore, intuitive judgment or suspicion by the prosecutor is insufficient to rebut the presumption of discrimination. Batson, 476 U.S. at 97, 106 S.Ct. at 1723. Finally, a prosecutor cannot overcome the presumption `merely by denying any discriminatory motive or "affirming his good faith in individual selections."' Batson, 476 U.S. at 98, 106 S.Ct. at 1723, citing Alexander, 405 U.S. at 632 [92 S.Ct. at 1226]."
Ex parte Branch, 526 So.2d at 623 (emphasis in original).
"Batson rejects the view in Swain that the Equal Protection Clause only requires that black citizens not be deprived of jury service by being systematically excluded from petit juries; Batson rests on a rationale that blacks are entitled not to be struck for racial reasons, and black defendants are entitled to be tried in a system free of racially exclusionary practices. This represents more than a group entitlement not to be entirely excluded from participation. Rather, under Batson, the striking of one black juror for a racial reason violates the Equal Protection Clause, even where other black jurors are seated, and even when valid reasons for the striking of some black jurors are shown. Accord Fleming v. Kemp, 794 F.2d 1478 (11th Cir.1986)....
"The trial judge is responsible to make the critical determinations of whether the defendant has established a prima facie showing and, if so, whether the prosecution has rebutted it. Failure by a prosecutor to explain every peremptory strike of black jurors is not necessarily fatal to the prosecutor's ability to rebut a prima facie case; likewise, explanation of most of the strikes on nonracial grounds does not necessarily rebut the inference created by Batson that peremptory challenges constitute a jury selection practice that permits `those to discriminate who are of a mind to discriminate.' 476 U.S. at 96, 106 S.Ct. at 1723 (citing Avery v. Georgia, 345 U.S. 559, 562, 73 S.Ct. 891 [892], 97 L.Ed. 1244 (1953)). ... Above all, the ... court should bear in mind that the command of Batson is to eliminate, not merely to minimize, racial discrimination in jury selection."
United States v. David, 803 F.2d 1567, 1571 (11th Cir.1986) (footnote omitted).
We conclude that the state has completely failed to produce race-neutral explanations for its peremptory strikes. The evidence it offered was insufficient to refute the presumption of discrimination. We are cognizant of the deference which should be accorded to the trial court's decision in cases of this kind. We should not reverse the trial court's determination unless that determination is clearly erroneous. Floyd v. State, 539 So.2d 357 (Ala.Cr.App.1987). Here, we find that the trial court's determinations that the district attorney's explanations were sufficient to overcome the presumption of discrimination, that his explanations were race-neutral, and that they met the requirements of Batson and Ex parte Branch are clearly erroneous. For this reason, appellant is entitled to a new trial.
We remand this case to the trial court with instructions that it enter an order granting appellant a new trial. Upon the filing of such an order, the trial court shall furnish this court with a copy of it so that we can dismiss this appeal.
OPINION EXTENDED; REMANDED WITH DIRECTIONS.
All Judges concur.

ON RETURN TO REMAND
PATTERSON, Judge.
On October 28, 1988, we remanded this case to the trial court with instructions to enter an order granting appellant, Gregory Acres, a new trial. This action was taken after we found that his constitutional rights had been violated by the state's exercise of its peremptory challenges in a racially discriminatory manner in selecting the jury that heard the case. The trial court complied with our remand by entering its order on May 25, 1989, granting appellant a new trial and restoring the case to the court docket. A copy of this order *475 has been filed with this court, and we consider it a proper return to our remand. Therefore, this appeal is due to be, and it is hereby, dismissed.
OPINION EXTENDED; DISMISSED.
All Judges concur.
NOTES
[1] On appeal, this court found no error vitiating Floyd's conviction, but we set aside his sentence of death and ordered a sentencing hearing. Floyd v. State, 486 So.2d 1309 (Ala.Cr.App.1984). On return to remand, we affirmed his conviction and his sentence of death. 486 So.2d at 1315. Our supreme court affirmed our judgment upholding Floyd's conviction and death sentence. Floyd, 486 So.2d 1321 (Ala.1986).
[2] Felder was also convicted of the capital murder of Jackson and sentenced to death. This conviction and sentence were affirmed on appeal to this court. Felder v. State, 470 So.2d 1321 (Ala.Cr.App.1984), and such judgment was affirmed by our supreme court. Felder, 470 So.2d 1330 (Ala.1985). However, the United States Supreme Court vacated that judgment and remanded Felder's cause for further consideration in light of Ake v. Oklahoma, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985). Felder v. Alabama, 474 U.S. 976, 106 S.Ct. 376, 88 L.Ed.2d 330 (1985). Our supreme court directed that the judgment of affirmance be set aside and the cause remanded. Felder, 491 So.2d 225 (Ala.1986). Upon remand, this court remanded the cause to the trial court. Felder, 491 So.2d 225 (Ala.Cr.App.1986). However, prior to disposition in the trial court, this court was notified that Felder died on January 9, 1987. A certificate of abatement of appeal was issued on February 4, 1987.
[3] The arrest warrant was not introduced into the record. Because we can not review the affidavit to determine whether the information conveyed to the magistrate provided a substantial basis to conclude that probable cause existed, we will treat appellant's arrest as a warrantless arrest. Cf. Johnston v. State, 455 So.2d 152 (Ala.Cr.App.1984).
[4] We note that these factual assertions are not supported by the record. Allegations in brief which recite matters not disclosed in the record can not be considered on appeal. Huffman v. State, 360 So.2d 1038 (Ala.Cr.App.1977), aff'd, 360 So.2d 1045 (Ala.1978).
[5] "To establish [a prima facie case of purposeful discrimination], the defendant first must show that he is a member of a cognizable racial group, Castaneda v. Partida, [430 U.S. 482], at 494 [97 S.Ct. 1272, 1280, 51 L.Ed.2d 498] [(1977)], and that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race. Second, the defendant is entitled to rely on the fact, as to which there can be no dispute, that peremptory challenges constitute a jury selection practice that permits `those to discriminate who are of a mind to discriminate.' Avery v. Georgia, [345 U.S. 559], at 562 [73 S.Ct. 891, 892, 97 L.Ed. 1244] [ (1953) ]. Finally, the defendant must show that these facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude the veniremen from the petit jury on account of their race. This combination of factors in the empanelling of the petit jury, as in the selection of the venire, raises the necessary inference of purposeful discrimination."

Batson, 476 U.S. at 96, 106 S.Ct. at 1723.
[6] Without intending to foreclose an independent and careful consideration by the trial court on this question, we note that we have serious misgivings about whether the instant facts could support a finding that appellant failed to make the requisite showing.
[1] We note the following procedural history of this case: The trial of this cause commenced on March 21, 1983, and appellant was sentenced by the trial court on June 2, 1983. These proceedings were submitted to this court for review on November 5, 1984. The Supreme Court released its opinion in Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), on April 30, 1986, and the retroactivity of that holding was not decided until our supreme court's opinion of Ex parte Jackson, 516 So.2d 768 (Ala.1986), which was released on December 19, 1986, and in which rehearing was denied on February 20, 1987. Upon these cases, we remanded the instant cause on February 10, 1987. The state applied for rehearing on February 24, 1987, and we overruled that application, with opinion, on March 24, 1987. Certificate of remand was issued on April 14, 1987; the hearing was held on June 30, 1987; the trial court issued its order on July 5, 1988; and return to remand was filed with this court on August 24, 1988.